# Exhibit 11

Civil Action No. 11-1928 (JEB)

**MOTION OF FRIENDS OF THE EARTH, INC. AND SIERRA CLUB TO INTEVENE AS DEFENDANTS**

COMMENTS

OF

## FRIENDS OF THE EARTH

ON

## DRAFT ENVIRONMENTAL IMPACT STATEMENT

FOR

## KLINGLE ROAD

*Submitted by:*

*Brent Blackwelder*

*President, Friends of the Earth*

*September 15, 2005*

**TABLE OF CONTENTS**

*Page*

I      Introduction...................................................................2

II     Overview......................................................................3

III    The Draft EIS Contains A Truncated And Wholly Misleading
       History Of The Events Leading Up To This EIS......................5

IV     The Draft EIS Does Not Explain The Purpose Or Need For
       The Proposed Klingle Valley Road, Contrary To NEPA...........12

V      The Draft EIS Does Not Consider Reasonable Non-Road
       Alternatives To Rebuilding Klingle Valley Road, Contrary
       To NEPA......................................................................15

VI     The Draft EIS Presents A Bland And, Therefore, Inherently
       Biased Introduction To Both Rock Creek And Klingle Valley....18

VII    The Draft EIS Utterly Fails To Address The Safety Of Area
       School Children............................................................19

VIII   The Draft EIS Does Not Accurately Present The Results
       Of The Traffic Impact Study, Which Concluded Reopening
       Klingle Road Would Dramatically <u>Worsen</u> Traffic At The
       Beach Drive/Porter Street Intersection..............................25

IX     The Draft EIS Does Not Accurately Measure Traffic
       Impacts At The Western Terminus Of Klingle Road................31

X      The Draft EIS Fails To Address The Adverse Impacts
       Associated With Parking Constraints During Construction
       Of The Proposed Road, Contrary To NEPA.......................36

XI     The Draft EIS Fails To Comply With Applicable Federal
       Floodplain Management Laws .........................................41

XII    The Draft EIS Fails To Address The Ongoing Water
       Pollution Impacts Which Would Be Created By Rebuilding
       Klingle Road................................................................44

XIII   The Draft EIS Does Not Provide Sufficient Information To
       Allow Adequate Public Comment On The Stormwater
       Analysis......................................................................50

XIV    The Stormwater Analysis In The Draft EIS Ignores Key
       Environmental Concerns Which The District Must Address
       As A Matter Of Federal Law............................................55

XV     The Draft EIS Does Not Address The Impact Of The
       Proposed Road On Development In The Project Area,
       Contrary To NEPA........................................................57

XVI    The Draft EIS Does Not Consistently Or Adequately Define
       The "Study" Or "Project" Areas Or Accurately Locate City
       Streets Or Watersheds...................................................59

XVII   Conclusion..................................................................64

# I. Introduction

Friends of the Earth is a non-profit, membership-based environmental organization dedicated to championing a healthy planet and a just world.[1] Friends of the Earth convenes the DC Environmental Network, a network of over 120 local and national organizations with a vision of rebuilding Washington, D.C.'s neighborhoods for long-term economic stability by protecting and restoring the Capitol City's urban environment; among other projects, the network successfully opposed the Barney Circle Interstate highway project.

Since 1994, Friends of the Earth, along with Taxpayers for Common Sense and the U.S. Public Interest Research Group, has spearheaded the *Green Scissors Campaign*, an effort to end wasteful government subsidies for destroying precious natural resources. The *Green Scissors Campaign* for the District of Columbia is part of this national campaign. The premise of the campaign is simple:

> "The District of Columbia is at a crossroads. Revenue shortfalls and pollution problems are eroding the financial and environmental stability of the city. The impact of hundreds of thousands of commuters, the slowing economy and added costs associated with local terrorism responsibilities are draining the resources of the District.... Unless the District's budget and environmental problems are solved, DC residents will be adversely impacted for years to come. The Green Scissors report offers attainable and realistic solutions to help reconcile the District's revenue shortages and improve the environment."[2]

The DC campaign's most recent report highlights more than $642 million in budget savings that could be realized by ending wasteful transportation projects, reforming the property tax system, and requiring the beneficiaries of the District's environmental infrastructure to pay their fair share; the proposed reconstruction of Klingle Road leads the list of projects we recommend scrapping.[3] In furtherance of that goal, Friends of the Earth

---

[1] Friends of the Earth is the U.S. voice of Friends of the Earth International, an international network of grassroots organizations in more than 70 countries.
[2] "Green Scissors 2003, District of Columbia: 8 recommendations to save money and protect the environment in the District of Columbia."
[3] Id.

2

has actively participated in the public hearings and meetings on the fate of Klingle Valley and now, on behalf of its members who use and enjoy Klingle Valley and Rock Creek Park, submits these comments on the "Draft Environmental Impact Statement for Klingle Road" (which we refer to in these comments, for the sake of brevity, as the "Draft EIS" or "DEIS").[4]

## II. Overview

Overall, we are deeply disappointed in the Draft Environmental Impact Statement – and disturbed by the precedent this document sets for future NEPA activities in the District of Columbia and elsewhere. This is the District's first major Environmental Impact Statement. It is intended to address two separate, distinct actions which the District is considering in tandem:

1. constructing a new road on a 0.7 mile stretch of land that transverses Rock Creek Park, an arm of the National Park Service, on a site where a prior road washed away; and
2. constructing a series of storm sewers of dubious effectiveness.

As the first District EIS of its kind, this EIS merits special scrutiny for three reasons. First, the EIS will decide the fate of Klingle Valley, a densely wooded area rich in biodiversity with a boulder-strewn creek and 100-year old trees that provide an excellent habitat for a wide variety of birds and other wildlife. Klingle Valley is an arm of Rock Creek National Park, one of the oldest and largest forested urban parks in the country, receiving 2 million recreational visitors annually.

Second, this EIS is precedent-setting. It will establish the framework for procedures the District government will use to ensure compliance with both the National Environmental Policy Act (NEPA) and the District's own Environmental Policy Act in subsequent EISs. In addition, to the extent that this EIS interprets other Federal or District environmental laws (e.g., Federal Clean Water Act stormwater management and water quality requirements), it may set precedent for environmental programs as well.

Third, this EIS requires the participation of the Federal Highway Administration and the National Park Service, among other Federal

---

[4] Unless otherwise indicated, citations in these comments are to the first volume of the Draft EIS.

3

agencies. Therefore, this EIS can help determine how these Federal agencies supervise State and local adherence to relevant statutory mandates.

Despite its significance, though, this document is woefully deficient. It resembles a bad sandwich. At either end (e.g., in the Executive Summary and Conclusions Chapter), lie puffy assurances that all will be well: "The proposed project will be beneficial to residents and commuters" promise the authors. See DEIS, p. ES-4 and 6-12. But buried in the middle of the document, vaguely mentioned within pages of dense text and Appendices – often in obscure footnotes – lies the indigestible message: the proposed road will worsen traffic congestion at most of the key intersections studied – dramatically so at Beach Drive and Porter Street, pose unexamined safety risks to area school children, degrade water quality and groundwater, foreclose important stormwater management options, interfere with floodplain management, impair Klingle Creek's contribution to the Rock Creek Park ecosystem, supplant more environmentally beneficial uses of Klingle Valley, and needlessly consume fiscal resources better spent on other projects. The document also fails to serve the most important function of an EIS – to analyze carefully all relevant alternatives to a proposed action. Instead, this document only tries to justify a foreordained outcome: construction of an unnecessary and wasteful road which will pour 3,845 to 4,960 additional cars per day into residential neighborhoods.

In the pages that follow, we briefly outline numerous factual and legal errors which pervade this document. Before doing so, however, it is only fair to note that the District Department of Transportation employees who authored and/or managed the preparation of this document faced an exceedingly difficult task. In 1991, DDOT closed the relevant portion of Klingle Road, a decision which DDOT now graciously – though unwisely – fails to mention in the DEIS. Instead, the authors opt for the vague passive voice (i.e., the road "was closed") without saying who made this decision or why.

Throughout three successive mayoral administrations (i.e., Sharon Pratt Kelly, Marion Barry, and Anthony Williams), DDOT continued to close the sealed-off portion of the road to vehicular traffic. In 2001, Mayor Williams announced, on DDOT's recommendation, that the closed portion of Klingle Road would be permanently closed to motor vehicle traffic, a recommendation which DDOT again graciously – though also unwisely – fails to mention in reciting the history behind the current proposal.

4

The District Council then spent two years debating the merits of reconstructing Klingle Road before issuing a cryptic, one-sentence mandate that the road "shall be re-opened to the public for motor vehicle traffic" as an attachment to the Fiscal Year 2004 Budget Act.  See DEIS, p. 1-1.

DDOT, having been told what the outcome of this EIS process should be, may feel understandably constrained by roadway proponents on the Council.  NEPA, however, requires that DDOT nonetheless "provide full and fair discussion of significant environmental impacts and ... inform decision-makers and the public of reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment," 40 CFR 1502.1, because NEPA rests on the premise that fully-informed policy-makers will make better decisions, regardless of their initial predispositions.  That is especially true where, as here, Council membership has changed significantly between start and completion of this Draft EIS.

A sharper word, however, needs to be addressed to the Federal agencies participating in this EIS.  They are not bound by any actions of the DC Council; to the contrary, they are required by both NEPA and other Federal laws, including their authorizing statutes, to ensure that an EIS meets Federal standards, regardless of what local governments may wish to do.  Here, they have merely rubber-stamped a flawed, deficient document. Federal law requires more.

## III.  The Draft EIS Contains A Truncated and Wholly Misleading History of the Events Leading Up To This EIS.

The Draft EIS describes only three relevant aspects of the history behind this EIS:

1.    Klingle Road was closed in 1991 due to "severe deterioration of the roadway, headwalls, and underlying storm water systems." DEIS, p. 1-11.
2.    The D.C. Council considered, but never passed into law, the Klingle Road Restoration Act of 2003 (the provisions of which are never described in this Draft EIS). DEIS, p. 1-11.
3.    On November 13, 2003, the City Council passed the Fiscal Year 2004 Budget Support Act of 2003, which mandated reopening of Klingle Road to motor vehicle traffic and

5

establishment of a stormwater management plan.  DEIS, pp. ES-1, 1-10, and 1-11.

With this abbreviated history, readers of this document, including key federal policymakers and citizens who have resided in the area for less than 3 years, would never know that the Mayor and DDOT previously decided that Klingle Road should not be reopened to motor vehicle traffic (as this Draft EIS now recommends).  Nor would they learn of the degree of long-standing public opposition to this project, the existence of detailed and unfavorable analytical critiques of this project by other District agencies, the extent to which DDOT, the agency sponsoring this Draft EIS, took positions on key issues directly contrary to those now presented in this draft, and the number of times promising non-road alternatives not considered in this draft have been endorsed by key government officials, including members of the D.C. Council.

NEPA requires that an EIS be candid, complete, and thorough – in essence, a full disclosure document.  This document achieves the opposite, disingenuous result; it ignores crucial history and whitewashes what little background it presents in order to produce an EIS that appears to support but one alternative: a road with an underlying stormwater management system (of no particular level of effectiveness).

This Draft EIS should be rewritten to include a full and fair recitation of the history behind this project.  At a minimum, that history should accurately summarize prior Mayoral and DDOT positions on this project, the position of other relevant District agencies, including the Department of Health and the Fire and Emergency Medical Services Department, and the correspondence and feedback DDOT has received from City Councilmembers.

This history should note that, after considering the matter at length, Mayor Williams and DDOT concluded – and publicly stated – that Klingle Road should not be reopened to vehicular traffic, but instead should be converted to strictly pedestrian/bicycle use for four key reasons.

First, the Mayor and DDOT cited the adverse traffic impacts a reopened road would have on neighborhood streets:

6

"[R]eopening Klingle Road would lead to a significant volume increase at the intersection of Woodley Road and 34th Street, with the already failed eastbound approach experiencing more delays.... In addition, because of the well-founded desire of communities for less traffic in their neighborhoods, DDOT recently began a comprehensive program of neighborhood traffic calming. Reopening Klingle Road [to vehicular traffic] would violate this policy of discouraging cut-through traffic on residential streets; some 3,000 cars would be added to the residential neighborhood around Woodley Road.... Reopening Klingle Road to vehicles would, again, run counter to our policy of keeping commuter traffic where it belongs."[5]

Next, the Mayor and DDOT concluded that the excessive costs of constructing Klingle Road outweighed the road's questionable benefits and diverted funding from more significant infrastructure repair priorities:

"A major factor leading to our decision to support [converting Klingle Road to a non-vehicular, bicycle/recreation facility] was the relative costs of reconstructing the roadway versus building a bicycle facility coupled with the questionable benefits of the roadway as analyzed in the Feasibility Study. The estimated cost to reconstruct the roadway on the original alignment is approximately $5.71 million.[6] This section of Klingle Road served approximately 3,200 vehicles per day prior to closure. We believe this is an extremely high price to pay to provide minimal traffic congestion relief with so many other transportation projects awaiting funding. Over the next six years, the District has $206 million in planned capital projects that cannot be supported by anticipated revenue. Approximately $4.2 million [the cost difference in 2003 estimates between converting Klingle Road to a strictly bicycle/pedestrian facility and rebuilding Klingle Road on its original alignment] in roadway repairs, bridge repairs, traffic signal or lighting repairs, or other federal-aid eligible repairs would need to be deferred to make room for this project.... Overall travel time delay

---

[5] Testimony of the Department of Transportation, Daniel Tangherlini, Director, and Anthony A. Willams, Mayor, dated March 13, 2003, before the Committee of the Whole, Linda Cropp, Chairperson, and the Committee on Public Works, and the Environment, Carol Schwartz, Chairperson, on Klingle Road Restoration Act of 2003, Bill 15-61 and Klingle Road Use Resolution of 2003, PR 15-58.
[6] Indeed, this figure has now increased to $7.18 million. DEIS, p. 2-9.

7

would not be significantly improved if Klingle Road were reopened to vehicular traffic."[7]

Third, the Mayor and DDOT expressed environmental concerns about a reopened roadway:

> "Reopening Klingle Road to vehicular traffic would require the removal of some large trees. It would also have noise impacts on adjacent areas...."[8]

Finally, the Mayor and DDOT cited the opposition of other environmental and safety agencies to a reopened road:

> "The National Park Service (NPS) does not support reopening Klingle Road to vehicular traffic.... The D.C. Department of Health, the District's water quality regulatory agency, has also expressed its opposition to reopening the road to vehicular traffic. DOH concerns about reopening Klingle Road to vehicles include adverse water quality, air quality, noise and wildlife impacts. Further, the Fire and Emergency Medical Services Department has stated that Klingle Road is not an important roadway for responding to fire and emergency medical service emergencies because of its narrow lanes, steep slopes, dangerous curves, insufficient lighting, and other constraints."[9]

The Klingle Road Restoration Act of 2003 proposed to depart from the Mayoral and DDOT position outlined above; the Act recommended Klingle Road be reopened to both motor vehicle traffic and recreational uses, including a hiker-biker trail. However, the Act differed from the position represented by this Draft EIS in that it recommended "a full and careful consideration of alternatives." It specified that this analysis should be "guided by policies of the National Environmental Policy Act," should identify all environmental issues, and should fully involve the public – aspects of NEPA that have been ignored in this Draft EIS, as we discuss

---

[7] Testimony of the Department of Transportation, Daniel Tangherlini, Director, and Anthony Williams, Mayor, dated March 13, 2003, supra.

[8] Id.

[9] Id. See also, letter dated February 21, 2003, from Adrian Thompson, Acting Fire/EMS Chief, to Honorable Anthony A. Williams, Mayor: "The DC Fire and Emergency Medical Services Department is not considering the use of Klingle Road as a primary emergency response route.... Klingle Road is not a priority artery in responding to both fire and emergency medical service emergencies. It is not a desirable response road primarily because it has narrow lanes, steep slopes, dangerous curves, insufficient lighting, and other hampering circumstances.... I have no issue with the road remaining closed to vehicular traffic."

below.  The Act also directed that this analysis include a hydraulic and hydrology stormwater management study, including a "quantitative analysis of the storm water drainage," and an east-west transportation study, forecasting, among other things, "increases in east-west trips due to retail, residential and commercial growth and because of changes in travel into and out of the District" – aspects of a proper NEPA analysis that have been short-changed in this Draft EIS, as we also discuss below.  In any event, the Act languished in a sharply divided City Council, lacking the votes to become law over a Mayoral veto.

In a legislative tactic without historical precedent in the District, proponents of a reopened Klingle Road then attached a one-sentence measure to the Fiscal Year 2004 Budget Support Act mandating that Klingle Road "shall be reopened to the public for motor vehicle traffic" and road reconstruction "shall include ... a storm water management plan."  This budget measure became law by a slim margin, largely because the Mayor would have had to veto the entire city-wide budget in order to block reopening of Klingle Road.

For purposes of NEPA compliance, the enacted budget measure compares quite unfavorably to the prior restoration bill (which, as we have noted, goes undescribed in the Draft EIS).  Unlike the prior restoration bill, the budget measure makes no mention of NEPA policies, consideration of other alternatives, identification of all environmental issues, public involvement, or further studies of any kind.

After passage of the Budget Act, the Council continued to put pressure on DDOT to curtail both the depth of analysis and the outcome of the EIS.  For example, D.C. Councilmember At-Large Carol Schwartz, Chairman of the Committee on Public Works and the Environment, in a letter dated June 24, 2003, wrote DDOT Director Dan Tangherlini, urging DDOT to curtail time allocated to studying Klingle Valley's hydrology:

> "I would like to recommend that you review the timelines ... and proceed much more aggressively with [construction of Klingle Road].... For example, rather than anticipating a four-month period for the hydrology study I recommend that Berger be given two months to complete the study."

She also asked DDOT to curtail time spent on an EIS:

9

"[P]lease do not insult my intelligence – your consultant certainly does not need 12 months to prepare an environmental impact statement (EIS) for Klingle Road…. I recommend that no more than 4 months be given for this report…." Id.

Finally, she directed that the EIS justify only a predetermined outcome (i.e., construction of Klingle Road):

"[Y]ou tell us all the time about the improvements that have occurred at the Department of Transportation. Now why are you selling yourself short by proposing completion of Klingle Road in the Spring of 2006 – 3 long years and probably 2 more than necessary? The Council's successful struggle to secure a dedicated source of funding for DDOT was a creative and bold act on my part and I expect the Director of the Department of Transportation to also act creatively and boldly when the Council sets policy. Enough with the delays. The battle is over. Repair the road." Id.

At a D.C. Council budget hearing on April 8, 2004, three Council members, all strong supporters of reopening Klingle Road, again complained about time spent developing an EIS. Committee Chairman Schwartz told DDOT:

"The battle was long and divisive, but the battle is over. Repair the road."[10]

Ward 4 member Adrian Fenty argued: "[T]his is just one more year with no road."[11]

DDOT Director Tangherlini cited NEPA requirements, though more as a hollow procedural hurdle to be overcome rather than the action-forcing analytical tool mandated by Congress. Indeed, Director Tangherlini guaranteed the Council its prejudged outcome, insisting a study of non-road alternatives was merely for "show" to avoid legal challenges:

---

[10] Elizabeth Wiener, "Klingle Road study sparks debate at budget hearing," The Current, Wednesday, April 14, 2004, pp. 3 and 30.
[11] Id.

"We're going to move forward on rebuilding the road.... We will do everything in our power to make it happen. But there is higher authority, federal law.... Federal law doesn't allow us to only examine two options. We have to pursue 'no action,' and we have to examine others to show contrast."[12]

Informed of federal requirements, Ward I Councilmember Jim Graham still expressed dissatisfaction with the need for an EIS, arguing the outcome of the EIS was preordained:

"What more information do we need? We've held lengthy hearings, heard dozens of witnesses. There's only two options here: either a road with a bike and pedestrian path, or not. I thought we made that decision last spring."[13]

---

[12] Id.

[13] Id. It should be noted that not all Council members shared this view. Councilmember At-Large Phil Mendelson, in a letter dated December 2, 2003, wrote DDOT Director Tangherlini:

"I understand that you have been criticized for deciding, in conjunction with the Federal Government, to proceed with the reconstruction of Klingle Road first by preparation of an environmental impact statement (EIS). I write to support your decision. Whatever one's view of the merits of this project, i[t] seems foolish and short sighted if the reconstruction short-cuts requirements. An EIS is meant to reveal critical information. More importantly, the project will not be timely if it is tied up in the courts over failure to meet the NEPA process. Proponents of the road should not be afraid of the facts. I look forward to the results of the EIS."

Ward 2 Councilmember Jack Evans, in a letter dated December 5, 2003 to Director Tangherlini, also urged a full and fair EIS. Citing "informed testimony about the potentially deleterious environmental, traffic, cost-benefit, and other impacts of building a paved roadbed for car traffic inside the Klingle watershed," he insisted, "[I]t is important that a comprehensive EIS be completed.... A thorough EIS will help us better understand the ultimate costs involved in re-building Klingle Road." Ward 3 Councilmember Kathy Patterson, in a letter dated January 22, 2001, had earlier written to Mayor Anthony A. Williams:

"I ... hope that you will not reach a conclusion with regard to the future of Klingle Valley without giving due regard to all of the analysis, including that of DOH, prepared on the subject. Further, I encourage you to bring to any recommendation on the future of this area your record as an environmentalist and careful guardian of taxpayer money. My own view is that the environmental degradation to Klingle Valley must be addressed and the area preserved as green space, possibly including a bike and/or hiking path but not including the construction of a roadway for automobiles. My view is based on environmental and financial concerns....The financial concern is this: constructing a 1-way or 2-way roadway in such a manner that addresses the considerable environmental concerns in Klingle Valley will require an investment of $5 to $6 million. That level of funding could be put to far better use in traffic mitigation including widening major arterials to reduce traffic in residential areas."

## IV.  The Draft EIS Does Not Explain The Purpose Or Need For The Proposed Klingle Valley Road, Contrary To NEPA.

The Draft EIS fails to address the most basic and obvious question: why build Klingle Valley Road?  What need does this road serve?

The Draft makes clear this is no ordinary road.  Klingle Valley Road will not serve the usual purpose of a new thoroughfare in a developed part of the District – in other words, the road will **not** relieve traffic congestion:

> "During the course of studying the origin-destination of households surrounding Klingle Road and existing counts at local intersections, new information regarding the travel pattern of area residents indicate that **traffic congestion as stated in the *2001 Klingle Road Feasibility Study* (DDOT 2001) is not largely affected by the reopening of Klingle Road."**  DEIS, p. 1-21(emphasis added).

In the absence of any traffic benefits, the authors of this Draft EIS concoct a purported rationale for Klingle Valley Road that goes as follows: a road once existed on this spot, the D.C. Council directed that a new road be rebuilt on the same spot, and a road on this spot would "connect" one place to another.  The Draft EIS states:

> "Klingle Road is listed as a federal aid collector route for vehicular traffic on the District of Columbia's Functional Classification Map. *Collectors serve a variety of functions, including providing citywide or large district connectivity and circulation by collecting traffic from local roads and connecting them with arterials.... In 1991, prior to its closure, the Klingle Road ... supported east-west access for residents of the Crestwood, Mount Pleasant, Cleveland Park, Woodley Park and other neighborhoods by connecting to major arterial roads such as Wisconsin Avenue and 16th Street.  Since 1991, the closed portion of Klingle Road has disrupted the continuity of this circulation route for the aforementioned neighborhoods."*  DEIS, p. 1-2 (emphasis added).

Like the Emperor's new clothes, this concocted rationale is purely illusory.  The first highlighted sentence merely defines collector roads in general; it sheds no light on why we should build *this portion of this collector road*.  The second highlighted sentence defines the function of

12

Klingle Road *in its entirety*, including never-closed segments as well as the now-closed Klingle Valley segment at issue in this EIS.

The never-closed portions of Klingle Road still serve collector functions: the western portion collects local traffic from Cleveland Park and Woodley Park and deposits it close to the Wisconsin Avenue artery. The easternmost segment collects local traffic from Cleveland Park and Woodley Park and arterial traffic from Connecticut Avenue (via Porter Street) and deposits it in Mount Pleasant close to the 16th Street artery; it concomitantly offers Mount Pleasant residents an avenue into Cleveland and Woodley Parks and Connecticut Avenue. Nothing at issue here would prevent the still-open portions of Klingle Road from continuing to serve these collector functions.

What is at issue here, though, is the value of, or need for, reopening the 0.7 mile *closed portion* of Klingle Road, which traverses Klingle Valley and which, instead of serving as a collector, would perform the *reverse* function: depositing arterial traffic on local residential streets, including Woodley Road, 32nd Street, Cathedral Road, 29th Street, Cleveland Street, Lowell Street, Macomb Street, and the narrow, non-collector portion of Klingle Road (from 32nd Street to 34th).

The D.C. Council directive sheds no light on why we should rebuild this 0.7 mile road segment. Embodied in a single sentence of a budget measure (the Fiscal Year 2004 Budget Support Act of 2003), the Council's directive lacks the Findings of Fact, Statement of Purposes, Statement of Policy, or explicit rationale often accompanying substantive authorizing legislation. It is not even clear the Council, which has undergone substantial membership change, would continue to support its earlier directive – given that: a) the projected $7.18 million rebuilding costs (for the preferred alternative) are roughly $1.5 million higher than 2003 estimates;[14] b) "new information" confirms this expenditure will not relieve traffic congestion, (see DEIS, p. 1-21); c) the new Traffic Impact Study reveals a reopened Klingle Road will make traffic <u>worse</u> at the Beach Drive/Porter Street intersection; and d) the new stormwater management plan demonstrates the

---

[14] Compare DEIS, p. 2-9 with Testimony of the Department of Transportation, Daniel Tangherlini, Director, and Anthony A. Willams, Mayor, dated March 13, 2003, before the Committee of the Whole, Linda Cropp, Chairperson, and the Committee on Public Works, and the Environment, Carol Schwartz, Chairperson, on Klingle Road Restoration Act of 2003, Bill 15-61 and Klingle Road Use Resolution of 2003, PR 15-58.

13

lack of land in the Klingle Creek area for stormwater detention and treatment. DEIS, Vol. II, App. A, p. 5-1.

We are left, then, with the Draft EIS's vague, undefined notion of "connectivity":

> "[T]he improved connectivity the road would provide to local connections once it is reopened provides a substantial rationale...." DEIS, p. 1-21.

This rationale begs the question: it merely states what a road physically does (i.e., it paves space between one location and another). It does not explain the purpose or need for the road: what is lacking? What needs to be "connected" that is not already served by the existing Klingle/Porter corridor or the Calvert Street artery between Mount Pleasant and Woodley Park (which, tellingly, goes unmentioned in the Draft EIS)? If existing roads already connect adjacent neighborhoods and a new road will not relieve traffic congestion, what other ends will the new road serve? What is its utility?

NEPA and the implementing CEQ regulations require an EIS to contain a "clear, concise, and to the point" statement of the *purpose and need* for the project under consideration:

> "The [EIS] statement shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 CFR 1502.13. See also 40 CFR 1502.1.

There is a reason why this statement opens the EIS: clear definition of the agency's objectives enables the agency to identify reasonable alternatives to the proposed action. For example, one plausible rationale for building roads between adjacent neighborhoods might be a planner's interest in enabling people in one neighborhood to meet those in another so that neither locale becomes isolated. But if this is the objective here, it would be better served by alternatives "eliminated from consideration" in this Draft EIS, including parks, green space, bicycle and recreational facilities,[15]

---

[15] The Draft eliminated two non-road options from consideration – the Green Space and Bicycle, Recreation, and Facility management options – because neither met the Fiscal Year 2004 Budget Support Act's call for a road. DEIS, p. 2-2.

14

which, unlike additional roads, actually enable residents to interact with each other.

Had this Draft adhered to the NEPA requirement for a clear statement of project purpose and need, it might not have run so egregiously afoul of numerous other NEPA requirements as outlined below. But this Draft EIS, despite its verbiage and bold-typed headings, has not met this fundamental NEPA requirement.

## V. The Draft EIS Does Not Consider Reasonable Non-Road Alternatives To Rebuilding Klingle Valley Road, Contrary To NEPA.

The Fiscal Year 2004 Budget Support Act of 2003 dictates the outcome of this Draft EIS from the outset: it proclaims, in advance of a NEPA-required environmental analysis, there "shall" be a rebuilt road through Klingle Valley. The law reads:

> "The portion of Klingle Road, N.W., between Porter Street, N.W., on the east to Cortland Place, N.W., on the west *shall be re-opened* to the public for motor vehicle traffic, with the repair and reconstruction of Klingle Road, which shall include the establishment of a District Department of Transportation stormwater management plan, to commence no later than 180 days following November 13, 2003." (emphasis added) (D.C. Law 15-39; D.C. Official Code 9-115.11) DEIS, p. ES-1.

The authors of this Draft EIS obviously viewed themselves as constrained by this legislation – so much so that they deliberately excluded from consideration two non-road options presented in the *Klingle Road Feasibility Study*. The first option – dubbed the "Green Space" option – would have allowed the closed portion of Klingle Road to continuing returning to a largely natural state. DDOT would have closed the road, removed the roadbed, and revegetated the site. The second option – the Bicycle, Recreation, and Facility Management option – would have converted the closed portion of Klingle Road to a bike path, permanently excluding vehicular traffic. DEIS, p. 2-2.

The non-road options were financially reasonable, technically feasible, and environmentally sound; indeed, a non-road use of Klingle

15

Valley had been proferred by the Mayor,[16] supported by several D.C. Council members and the D.C. Department of Health,[17] and urged by large numbers of city residents. Before passage of the Budget Act, DDOT had testified it "supports the recommendation of the Mayor to reconstruct this portion of Klingle Road as a Bike and Recreation facility."[18] Ward 3 Councilmember Kathy Patterson also advocated the benefits of a non-road use of Klingle Valley:

> "My own view is that the environmental degradation to Klingle Valley must be addressed and the area preserved as green space, possibly including a bike and/or hiking path but not including the construction of a roadway for automobiles. My view is based on environmental and financial concerns...."[19]

The Draft EIS explains its authors felt compelled to exclude these alternatives from analysis by the Council's law:

> "Two non-road options presented in the Klingle Road Feasibility Study were eliminated from consideration in the EIS *in response to the Fiscal Year 2004 Budget Support Act of 2003.... Because the act mandates the reconstruction and reopening of Klingle Road,* the Green Space option and the Bicycle, Recreation, and Facility Management option were eliminated from further study because neither option fulfills the purpose or need for the proposed action." DEIS, p. 2-2(emphasis added).

To produce a document justifying a new road, therefore, the Draft EIS makes three fatal errors. First, it confines itself to considering (in addition to a "no action" alternative) only the size, type, and configuration of the road mandated by the Council, rather than exploring the promising non-road options. Second, the Draft EIS inappropriately links two separate projects: road construction and sewer repairs. It therefore frames the "no action" alternative to include no action on either road construction or sewer

---

[16] Testimony of the Department of Transportation, Daniel Tangherlini, Director, and Anthony A. Willams, Mayor, dated March 13, 2003, before the Committee of the Whole, Linda Cropp, Chairperson, and the Committee on Public Works, and the Environment, Carol Schwartz, Chairperson, on Klingle Road Restoration Act of 2003, Bill 15-61 and Klingle Road Use Resolution of 2003, PR 15-58.

[17] Id.

[18] Id.

[19] Letter dated January 22, 2001 from Ward 3 Councilmember Kathy Patterson to Mayor Anthony A. Williams.

16

repair (though it would be entirely possible – indeed, environmentally more beneficial from a water quality perspective – to repair the sewers without building a road atop the new sewer lines).  In other words, the Draft EIS fails to consider a true "no action" alternative for the road alone.  Finally, the Draft EIS credits all "build" alternatives with environmental benefits attributable only to the new sewer lines, in effect dressing the "wolf" of the various road alternatives in the "sheep's clothing" of the new sewer lines.

It is hard to imagine agency action that flies more directly in the face of NEPA.  NEPA and CEQ implementing regulations make clear that an EIS must precede **both** the decision to construct a road and the actual, physical design and construction:

> "NEPA procedures must insure that environmental information is available to public officials and citizens *before decisions and before actions are taken*."  40 CFR 1500.1(b) (emphasis added).

> "An environmental impact statement is more than a disclosure document.  It shall be *used* by Federal officials in conjunction with other relevant material to plan actions and make decisions." 40 CFR 1502.1(emphasis added).

> "An agency shall commence preparation of an environmental impact statement as close as possible to the time the agency is developing or is presented with a proposal (1508.23) so that preparation can be completed in time for the final statement to be included in any recommendation or report on the proposal.  The statement shall be prepared *early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made."* (emphasis added) 40 CFR 1502.5.

The alternatives analysis is "the heart of the environmental impact statement."  40 CFR 1502.14.  Agencies must "rigorously explore and objectively evaluate *all* reasonable alternatives (emphasis added)," not just those deemed acceptable by local legislative bodies.  Id.  DDOT officials may well claim that they have no discretion to ignore the Council's legislation.  In other words, if the Budget Support Act contravenes NEPA by committing the District to a course of action in advance of an EIS and regardless of any information which could be generated by a properly

prepared EIS, DDOT is powerless to correct the violation of law. Whatever the merits of this claim, the claim cannot be made by federal preparers of this EIS, including the Federal Highway Administration and the National Park Service. The District Council cannot commit these agencies to a *fait accomplit* in violation of NEPA. Indeed, NEPA requires that an EIS "include reasonable alternatives not within the jurisdiction of the lead agency." 40 CFR 1502.14(d).

## VI. The Draft EIS Presents A Bland And, Therefore, Inherently Biased Introduction To Both Rock Creek And Klingle Valley.

The Draft EIS introduces Rock Creek Park as a "unit" of the National Park System, and Klingle Valley as nothing more than a potential roadbed. The document should accurately describe the ecological and historical significance of both land areas – at the outset, so readers know exactly what is at stake in this decision-making process.

This should not be hard to do. The National Park Service attests Rock Creek Park is "truly a gem in our nation's capital:"[20]

- It is one of the nation's oldest and largest naturally managed urban parks.
- It serves as an ambassador for the national park idea
- Its forests and open spaces help define the character of the nation's capital.
- It was important in the early history of the region and in the development of the nation's capital.
- It encompasses a rugged stream valley of exceptional scenic beauty.
- It is home to 2,100 acres of valuable plant and wildlife habitat, in the midst of a heavily urbanized area.
- It is a historic designed landscape and a natural oasis for millions of urban dwellers.[21]

---

[20] National Park Service, "Rock Creek Park," available at www.nps.gov/rocr/ on September 6, 2005.
[21] The National Park Service, Department of the Interior's "Rock Creek Park and the Rock Creek and Potomac Parkway Draft General Management Plan Environmental Impact Statement Summary," p.3.

18

Klingle Valley, in addition to its own attributes, plays an important role in maintaining Rock Creek Park. The District government's "Klingle Valley Tributary: Environmental Analysis" explains this role:

> "Rock Creek Park contains numerous species of fish and wildlife which are not presently seen in the Klingle Branch Watershed because of the degraded nature of the habitat. Once the stream begins to recover, fish and wildlife species will return from other areas of the Rock Creek Park system. The stream will be able to return the favor, if the mainstem of Rock Creek is ever again negatively affected by pesticides, or accidental inputs of chlorinated water as has happened in the past. Healthy tributaries with healthy populations of resident fish are essential to repopulate the larger habitat. Without healthy tributary populations, recovery of the populations in Rock Creek could take a very long time."

The Draft EIS should acknowledge Klingle Creek's role in restoring and preserving the health of Rock Creek Park.

## VII. The Draft EIS Utterly Fails To Address the Safety of Area School Children.

The Draft EIS does not devote any section of its text to the safety of area school children. This is a rather astounding omission since six schools with a total enrollment of close to 3,000 students lie on or within a 1 to 2 block distance of Woodley and Klingle Roads and an additional 24 schools are nearby, bringing the area total to 30 schools. Collectively, this student population represents one of the largest concentrations of kindergarten through twelfth grade students in the city.[22]

These students present special safety needs. Many of these students are pedestrians – either for their entire commute or for that portion of it which extends from their schools to bus or metro stations. Significant numbers arrive and depart through carpools or school buses, where a single accident could injure a large number of students. At the high school level, a large number of students constitute newly licensed, inexperienced drivers who could strongly benefit from less congested roads.

---

[22] The total population includes several colleges and pre-schools as well.

19

Yet none of the Draft EIS's stated "objectives" for the preferred alternative encompass or even mention the physical safety of these students. Because of the Draft EIS's single-minded focus on building a road to allow approximately 5,000 additional vehicles to enter this local area, the "Traffic/Transportation" objective for the preferred alternative concentrates on "improved east-west vehicular linkages."[23] DEIS, p. 1-9. The "Safety" objective of the Draft EIS also concentrates entirely on the drivers of these cars; these objectives focus on AASHTO road design features, curbs and gutters, guardrails, and lighting.[24] DEIS, pp. 1-9 and 1-20. Narrowly focused objectives, in turn, restrict the scope of the transportation and safety "environmental impacts" addressed in the Draft EIS. See, e.g., DEIS, pp. 1-19 and 1-20. As a result, the Draft EIS ignores the heightened risk increased traffic volumes, more congested roads, longer intersection queues and delays, speeding vehicles, and greater demand for non-existing parking spaces pose to area students.

Failure to identify student safety as a project objective or to study the impact of the proposed project on area school children adversely impacts the demographic information, estimated "peak" traffic periods and volumes, traffic congestion assessments near school crossing zones, safety discussion, speed limit compliance analysis, proposed parking mitigation measures, and growth estimates presented in the Draft EIS, as we outline below.

1. Incomplete Demographic Information.

The Draft EIS exhibits a general sloppiness with respect to the limited data it presents on area students. To begin with, the Draft EIS does not adequately identify the area's student population. The Draft EIS derives its age-related demographic information purely from U.S. Census data; this database, in turn, portrays only residents, not students actually present in the area during periods of peak traffic. DEIS, p. 3-56.

Although the Draft EIS acknowledges the presence of 18 schools in the vicinity of Klingle Road, the document fails to mention another 12 schools within the same approximate geographic area (i.e., at similar

---

[23] This objective also mentions "a multi-modal linkage to recreational facilities for pedestrians and bicyclists," but this language presumably refers to the recreational path alternatives disfavored by the DEIS.

[24] This objective also mentions "sidewalks," but acknowledges this safety feature pertains only to some alternatives (i.e., those disfavored by the DEIS). The proposed Klingle Road will not include sidewalks.

20

distances from Klingle Road).  These include Sidwell Friends School, a nationally recognized educational institution, and National Child Research Center, a pre-school whose arrival and dismissal traffic has already been the subject of a DDOT safety study.  The omitted schools are listed in Table I below.

**Table I:**
**Schools Which Surround The**
**Closed Portion of Klingle Road And**
**Are Not Identified in the Draft EIS[25]**

| School | Location | Number of Students |
|---|---|---|
| Sidwell Friends School | 3825 Wisconsin Ave. | 800 |
| Sheridan School | 4400 36th St. | 216 |
| Janney Elementary School | 4130 Albemarle St. | 456 |
| Murch Elementary School | 4810 36th St. | 500 |
| Howard Univ. Law School | 2900 Van Ness St. | 444 |
| American Univ. Tenley Campus | Tenley Circle | 500 |
| Potomac College | 4000 Chesapeake St. | 200 |
| St. Ann's Academy | Nebraska Ave./Tenley Circle | 231 |
| Georgetown Day School | 4200 Davenport St. | 1,000 |
| National Presbyterian School | 4121 Nebraska Ave. | 270 |
| NCRC | 3209 Highland Place | 170 |
| Levine School of Music[26] | 2801 Upton St | 3,500 |
| **Total** | | **8,287** |

Plans to relocate Rock Creek International School at the Saint Sophia Greek Orthodox Cathedral educational facility on Garfield Street directly

---

[25] Student figures were obtained from the school's administrative or admissions office or from the Wisconsin Avenue Corridor Transportation Study conducted by The Louis Berger Group, Inc.
[26] These figures include students attending after-school classes at Levine.

across from the St. Albans School grounds may add yet another sizeable group of students to this population.

Next, the Draft EIS fails to identify the <u>number</u> of children at any of the schools mentioned above, whether or not the schools are listed in the Draft EIS. However, the size of the student population is crucial to identifying the extent of risk.

### 2. Failure To Assess Realistic "Peak" Traffic Periods And Volumes.

The Draft EIS never identifies <u>school start or dismissal times</u> for any of these area schools. Consequently, the Draft EIS assumes, without any evidentiary support, that "peak" vehicular traffic will be associated with <u>rush hour</u> commuting rather than <u>school</u> schedules. The heavy concentration of schools in this small geographic area, however, makes this assumption unwise. (The "Traffic Impacts" discussion in section IX of these comments explains the significance of this error in more detail.)

### 3. Failure To Assess Traffic Congestion Near Critical School Crossing Zones.

The Traffic Impact Study in the Draft EIS only studied congestion (measured as "Level of Service") on that portion of Woodley Road which extends from 34th Street to Cathedral Avenue. The study failed to look at vehicular traffic on the segment of Woodley Road which continues from 34th Street on to Wisconsin Avenue or at the volume of traffic entering Woodley Road from heavily traveled Wisconsin Avenue.

The not-studied portion of Woodley Road bifurcates the 575- student National Cathedral School campus (a fact the Draft EIS fails to mention). Students from this school, as well as from the 567-student coordinate St. Albans School, regularly traverse Woodley Road throughout the day as they switch from one campus building to another or from campus buildings to Washington National Cathedral facilities. Traffic entering and exiting the 387-student pre-K to 3rd grade Beavoir School also uses this road segment.

A significant number of vehicles already traverse this segment of Woodley Road on a daily basis. Figure D-4 in the Draft EIS shows that 116 vehicles or 42% of the vehicles traveling west on Woodley Road continue on to this "not studied" portion of Woodley during the weekday AM "peak"

22

defined in the Draft EIS; 76 vehicles (38% of those traveling west on Woodley) do so during the weekday PM "peak." (As noted earlier, these workplace-related traffic counts may underestimate true "peak" period traffic on road segments, like this, used for school access.)

This road segment also carries significant traffic entering Woodley Road from Wisconsin Avenue; Figure D-4 in the Draft EIS shows at least 432 vehicles traveling east on this segment during the weekday AM "peak" defined in the Draft EIS and 125 vehicles during the weekday PM "peak." (The latter figures may be underestimates; traffic traveling east on this segment of Woodley Road may have exited Woodley at 35th or 36th Streets or the Washington National Cathedral grounds before reaching DEIS traffic counters further down at the intersection of Woodley with 34th Street.) Finally, this road segment also contains significant numbers of vehicles turning in to Woodley Road from northbound and southbound 34th Street.

Vehicle queuing already takes place during this road segment at school start and dismissal times as well as when school crossing guards halt traffic to allow students to cross the road to travel between portions of the bifurcated National Cathedral School campus. The addition of 3,845 to 4,960 cars on Woodley Road will exacerbate the queuing, but the Draft EIS does not mention this problem.

4. Failure To Address Safety Of School Drop-off And Pick-up Procedures.

The Draft EIS did not examine school drop-off and pick-up procedures at any area school, but these procedures obviously cause vehicle queues, congestion, and safety risks to area students if not properly managed. In the one area school where expansion plans triggered a recent DDOT safety study (i.e., NCRC), DDOT found cause for concern. The presence of construction vehicles or a significant increase in traffic volumes could, if unexamined, create situations where school administrators are unable to handle drop-offs and pick-ups safely. NEPA requires the EIS to assess this risk.

5. Defective Speed Limit Compliance Analysis.

The Draft EIS ignores speed limits set to protect area school children. For example, the Draft EIS repeatedly describes the posted speed on

23

Woodley Road/Cathedral Avenue as 25 mph, (DEIS, Vol. III, App. D, pp. 18 and 20), but fails to inform readers that much of Woodley Road/ Cathedral Avenue is posted "15 mph <u>When Children Are Present</u> (emphasis added)." Segments bearing this designation include Woodley from Wisconsin Avenue to 36th Street, Woodley from South Road on the Washington National Cathedral grounds to 3409 Woodley Avenue, and the segment of Woodley extending from slightly east of Klingle Road to 29th Street. When the Draft EIS therefore found vehicles actually traveled on this road "close to the posted speed limit (25 mph)," it failed to assess whether children were or were not present during those travel times. If children were in the area, the recorded speeds, 10 mph over the child-protective limits, represent significant noncompliance.

6. <u>Inappropriate Proposed Parking Mitigation Measures.</u>

Several of the purported parking mitigation measures in the Draft EIS appear to be in direct conflict with safety needs of area school children. For example:

- Parking mitigation measures propose: "Whenever possible, deliveries and other construction activities would take place during off-peak travel hours." DEIS, p. 4-33. As we discuss more fully in the "Parking" section of these comments, the Draft EIS defines weekday "off-peak" hours as 9:30 AM to 3:30 PM. Compressing construction activity into this time period means heavy trucks, backhoes, and other large pieces of construction equipment are more likely to be traversing school neighborhoods and tying up traffic during periods of high student movement (e.g., during school dismissal times).

- Likewise, parking mitigation measures assume construction workers will depart their work site "after school lets out and before the evening rush hour." DEIS, p. 4-33. However, as we again discuss more fully in the "Parking" section of these comments, the Draft EIS defines the "peak" PM travel time as commencing at 3:30. DEIS, Vol. III, App. D, p. 12. This means workers will be driving through area streets in the 2:30 to 3:30 timeframe, coinciding with school dismissals.

7. <u>Failure To Account For Planned Growth In The Area.</u>

24

The Draft EIS did not study the likelihood of additional development at any area schools, erroneously concluding that no such development was planned. DEIS, p. 1-21. However, many of the schools in the immediate vicinity of Klingle are actively engaged in construction projects. These include: Maret School (where construction is still ongoing on a new wing and extended athletic field), NCRC (whose expansion plans are the subject of pending litigation), Sidwell School (which plans an underground garage), Washington International School (which plans an underground theater, classrooms, and a library information center), and St. Albans School (which has just obtained Board of Zoning Adjustment approval for a new academic and office wing, underground performing arts center, and reconfigured athletic fields).[27] The Washington National Cathedral also has a master plan for further development and is now building a large parking garage. (In addition, DDOT has identified several future paving projects to be performed in the Klingle Valley area). DEIS, Vol. II, App. A, p. 5-2.

There are two potentially significant consequences from failure to consider this development. First, area growth rates assumed in the EIS may not be accurate in light of these developments. Second, should construction of any of these projects coincide with construction of Klingle Road, the effect could be disastrous for both area residents and students. The Draft EIS should expressly identify, and weigh the impact of, school development plans at all area schools.

**VIII.  The Draft EIS Does Not Accurately Present The Results of the Traffic Impact Study, Which Concluded Reopening Klingle Road Would Dramatically <u>Worsen</u> Traffic At The Beach Drive/Porter Street Intersection.**

The Traffic Impact Study in the Draft EIS concludes transportation impacts at the Beach Drive/Porter Street/Klingle Road intersection, the eastern terminus of the proposed collector, would differ from impacts at the eleven other intersections studied. This T-shaped intersection in Rock Creek Park, dubbed "Intersection 10" in the Traffic Impact Study (DEIS, Vol. III, App. D, p. 11), contains a stop sign controlling vehicles approaching from Porter Street. A median on Beach Drive permits only one vehicle at a time

---

[27] "St. Albans wins OK for new wing, fields," <u>The Northwest Current</u>, September 14, 2005, p. 1.

25

from Porter Street to cross the southbound lane of Beach Drive and wait for entry into northbound traffic.

The Traffic Impact Study documents how reconstructing a two-lane road in Klingle Valley would add an estimated 3,845 to 4,960 vehicles per day to the now-closed roadway. DEIS, Vol. III, App. D, p. 29. Consequently, reopening Klingle as a two-lane road would cause *"dramatic increases in delay, and a significant deterioration in LOS [Level of Service]*, compared to the no build scenario" at the Beach Drive/Porter Street/Klingle Road terminus, where many vehicles collected via Klingle Road will choose to access the Beach Drive artery. DEIS, Vol. III, App. D, p. 43 (emphasis added). This finding clearly demonstrates the proposed roadway will worsen traffic at Beach Drive/Porter Street.

However, contrary to the clear-cut evidence, the Draft EIS: a) highlights only incoherent discussions of transportation impacts at Beach Drive and Porter Street, b) misstates the evidence, suggesting impacts would be beneficial, c) buries the admission of projected negative impacts in a two volume Appendix not likely to be read by much of the public, and d) understates the extent of the expected traffic problems at the Beach Drive/Porter Street intersection.

A.   <u>The Executive Summary Should Be Rewritten to Alert the Public to the Likelihood of Worsened Traffic at the Beach Drive/Porter Street Intersection If Klingle Road Is Reopened As a Two-Lane Road.</u>

The Executive Summary of the Draft EIS, the portion of the document likely to be read by most people, opens by discussing Beach Drive with a statement that is neither grammatical nor intelligible: "where heavy directional traffic that is expected to increase in the long-term." DEIS, p. ES-7. This statement, repeated verbatim later in the Draft EIS,[28] should be replaced with a clear summary of the research results.

The Executive Summary's next mention of Beach Drive/Porter Street impacts merely states: "Both delay times and LOS would be increased in the short and long-term." DEIS, p. ES-7; see also DEIS, p. 4-35. This, too, does not make sense to the average reader. Delay times and level of service do not "increase" in tandem; as vehicle delays increase, drivers experience

---

[28] See DEIS, p. 4-32.

26

from Porter Street to cross the southbound lane of Beach Drive and wait for entry into northbound traffic.

The Traffic Impact Study documents how reconstructing a two-lane road in Klingle Valley would add an estimated 3,845 to 4,960 vehicles per day to the now-closed roadway. DEIS, Vol. III, App. D, p. 29. Consequently, reopening Klingle as a two-lane road would cause "*dramatic increases in delay, and a significant deterioration in LOS [Level of Service],* compared to the no build scenario" at the Beach Drive/Porter Street/Klingle Road terminus, where many vehicles collected via Klingle Road will choose to access the Beach Drive artery. DEIS, Vol. III, App. D, p. 43 (emphasis added). This finding clearly demonstrates the proposed roadway will worsen traffic at Beach Drive/Porter Street.

However, contrary to the clear-cut evidence, the Draft EIS: a) highlights only incoherent discussions of transportation impacts at Beach Drive and Porter Street, b) misstates the evidence, suggesting impacts would be beneficial, c) buries the admission of projected negative impacts in a two volume Appendix not likely to be read by much of the public, and d) understates the extent of the expected traffic problems at the Beach Drive/Porter Street intersection.

A.      The Executive Summary Should Be Rewritten to Alert the Public to the Likelihood of Worsened Traffic at the Beach Drive/Porter Street Intersection If Klingle Road Is Reopened As a Two-Lane Road.

The Executive Summary of the Draft EIS, the portion of the document likely to be read by most people, opens by discussing Beach Drive with a statement that is neither grammatical nor intelligible: "where heavy directional traffic that is expected to increase in the long-term." DEIS, p. ES-7. This statement, repeated verbatim later in the Draft EIS,[28] should be replaced with a clear summary of the research results.

The Executive Summary's next mention of Beach Drive/Porter Street impacts merely states: "Both delay times and LOS would be increased in the short and long-term." DEIS, p. ES-7; see also DEIS, p. 4-35. This, too, does not make sense to the average reader. Delay times and level of service do not "increase" in tandem; as vehicle delays increase, drivers experience

---

[28] See DEIS, p. 4-32.

26

*deteriorated,* not improved, service. In any event, this discussion fails to mention the magnitude of the likely traffic problems: at this intersection, where traffic is now in the "acceptable" range, both AM and PM peak traffic is projected to reach LOS F, a level defined as "unacceptable to most drivers," in 2007 if Klingle Road reopens. See DEIS, Vol. III, App. D, pp. 23, 32, 35 and Appendix D-4.

The Executive Summary contains no other discussion of Beach Drive/ Porter Street transportation impacts. The Summary concludes by observing the preferred alternative "satisf[ies] the full intent of the purpose and need of this project as set forth by the District of Columbia City Council in 2003," a vague statement more conducive to lulling the public into complacency than alerting them to the likelihood of worsened traffic conditions.

> B.    <u>Patently Erroneous Statements That Traffic Conditions Will Improve at Beach Drive and Porter Street (And Elsewhere) Should Be Eliminated From the Draft EIS.</u>

Chapter 6 of the Draft EIS, entitled "Summary and Comparison of Impacts," a chapter likely to be the focus of much public attention, mentions transportation impacts three times. All three discussions *misstate* the evidence from the Traffic Impact Study.

First, chapter 6 dismisses *all* adverse transportation impacts from a reopened Klingle Road as too small to be noticeable:

> "Any unavoidable adverse impacts identified from the No Action/No Build Alternative or any of the five build alternatives would be so small they would not be noticeable. Overall changes in transportation would be beneficial." DEIS, p. 6-3.

Second, chapter 6 predicts a reopened Klingle Road will *relieve* congestion at Beach Drive and Porter Street:

> "Future traffic models show that there would only be slight beneficial impacts to local and regional traffic by reopening Klingle Road, and relieving a small part of the congestion along Porter Street and Beach Drive. Therefore, the project would result in an overall small, but

27

beneficial cumulative transportation impacts (sic)." DEIS, pp. 6-8 to 6-9.

Finally, chapter 6 states a reopened Klingle Road would solve transportation needs, improve transportation, and enhance traffic circulation:

"The proposed project would meet long-term transportation needs....The project would provide long-term improvements, and it would enhance local circulation." DEIS, p. 6-11.

All three statements are patently false. The Traffic Impact Study demonstrates a reopened Klingle Road would produce "dramatic increases in delay and a significant deterioration in LOS [Level of Service]" at Beach Drive/Porter Street. DEIS, Vol. III, App. D, p. 43. Instead of meeting transportation needs, the road would cause traffic now within the "acceptable" range to deteriorate to "unacceptable" levels; on average, each vehicle at this intersection would be delayed more than 2 minutes during the AM traffic peak and more than 1 ½ minutes during the PM traffic peak. DEIS, Vol. III, App. D, pp. 23, 35, 41-42, and D-4. Traffic, by definition, would "exceed the capacity of the intersection," with measurable increases in "driver discomfort and frustration, fuel consumption, and lost travel time." DEIS, Vol. III, App. D, D-4. In addition, drivers entering Beach Drive from Porter would be "likely to enter traffic more aggressively than under more moderate traffic conditions," increasing the risk of accidents. DEIS, Vol. III, App. D, p. 32, n. 3.

According to the Traffic Impact Study, traffic delays would also increase at 7 of the 11 other intersections studied, though not so noticeably as at Beach Drive and Porter Street. DEIS, Vol. III, App. D, p. 31, 37. The remaining four intersections would, in the long-term, experience an "almost imperceptible" reduction in vehicular delay of 2.5 seconds or less. DEIS, Vol. III, App. D, pp. 36-37. No other transportation benefits were identified.

In short, the three patently erroneous allusions to transportation benefits in chapter 6 should be replaced by the following accurate summary of the evidence compiled in the Traffic Impact Study: a reopened Klingle Road would create significantly worse traffic at Beach Drive/Porter Street, somewhat worse traffic at 7 other intersections, and no noticeable traffic improvements elsewhere in the study area.

C.      The Admission That Reopening Klingle Road Will Have Negative Traffic Impacts At Beach Drive/Porter Street Should Be Set Forth More Prominently And Candidly In The Draft EIS.

Deep within the text of the Draft EIS lies the document's sole coherent acknowledgement that the Traffic Impact Study demonstrates a reopened Klingle Road would significantly and adversely impact traffic at the Beach Drive/Porter Street intersection. Chapter 4 concedes:

"The Beach Drive/Porter Street intersection would experience dramatic increases in vehicle delay time, and a major deterioration in level of service, compared to the No Action/No Build Alternative." DEIS, p. 4-34. See also DEIS, Vol. III, App. D, p. 43.

However, the Draft EIS immediately follows this admission with a patently misleading assurance: "Delay time would be in a realistic range between 60 seconds and 75 seconds in the opening year and within a range between 98 seconds and 121 seconds in the long term..." Id. This statement directly contradicts the Traffic Impact Study, which states that delays of more than 35 seconds at unsignalized intersections like Beach Drive/Porter Street "are considered unacceptable." Delays of more than 50 seconds are defined as Level of Service (LOS) F, a level defined as "an intersection capacity failure condition with long delays." DEIS, p. 3-36. This level is "believed to be unacceptable to most drivers" in terms of "driver discomfort and frustration, fuel consumption, and lost travel time." DEIS, Vol. III, App. D, D-4. The Draft EIS purports to use a standard LOS analysis; it has cited no support for substituting its own estimate of "acceptability" for results obtained by applying the 2000 Highway Capacity Manual commonly used in practice.

In addition, the reference to "range" is inappropriate; the Traffic Impact Study results are single numbers, not ranges. The 60 and 121 second figures should be correctly identified as "AM Peak Hours" forecasts; the 75 and 98 second figures should be correctly identified as "PM Peak Hours" forecasts.

D.      The Draft EIS Inappropriately Understates the Adverse Traffic Impacts at Beach Drive/Porter Street; It Should Be More Forthcoming.

29

Expected vehicle delays at Beach Drive/Porter Street would be longer than those forecasted in the Draft EIS if the Traffic Impact Study assumed vehicles entered Beach Drive with the same degree of caution exercised at the other 11 intersections studied. However, "to simulate realistic traffic movement at this intersection," the Traffic Impact Study assumed vehicles at this intersection would be less cautious (i.e., they would enter Beach Drive at smaller openings in the oncoming traffic stream, rather than waiting for more typical gaps). DEIS, Vol. III, App. D, p. 32, n. 3.

The Traffic Impact Study defines "gap acceptance" as:

"the minimum time interval between vehicles in a major traffic stream (e.g., Beach Drive) that permits side street vehicles at a stop sign (e.g., Porter Street) to enter the intersection under prevailing traffic conditions. In other words, under heavy traffic flow, drivers on a side street are likely to enter traffic more aggressively than under more moderate traffic conditions." Id.

For the 11 other intersections studied, the Traffic Impact Study used a gap acceptance assumption of 6.7 seconds; in other words, it assumed vehicles on the side street would enter the major street whenever a gap of 6.7 seconds occurred between approaching cars. However, for the Beach Drive/Porter Street intersection, the Traffic Impact Study reduced this gap to 5 seconds. This had the effect of shortening estimated vehicle delays at this intersection (because modelers assumed vehicles would exit the intersection more quickly).

The Draft EIS's decision to reduce the gap acceptance assumption at this intersection is flawed in several respects. The Draft EIS does not cite any data or support for this decision. Neither does the Draft EIS explain why a lower gap acceptance is warranted for this intersection nor why, if a lower figure is warranted, that figure should be set at 5 seconds. The Draft EIS also does not explore whether vehicles entering this intersection at a faster clip increase the risk of accidents. Finally, the Draft EIS does not identify the likelihood of "more aggressive" driving as an adverse traffic impact, except in a footnote to tables contained in a two-volume appendix.

The Draft EIS should either:

a)    recalculate vehicle delays at the Beach Drive/Porter Street intersection using the same gap acceptance rate employed at other intersections – in other words, inform the public that vehicle delays will be even longer than previously forecasted for this intersection; or

b)    justify the decision to reduce the gap acceptance assumption by measuring the actual gap, but, if so, alert the public to the additional adverse traffic impact of "more aggressive" driving at this intersection in the Executive Summary, Chapter 4 ("Environmental Consequences"), and Chapter 6 ("Summary and Comparison of Impacts") portions of the DEIS.

NEPA requires that an EIS contain a "full and fair discussion of significant environmental impacts" and "rigorously explore and objectively evaluate all reasonable alternatives." 40 CFR 1502.1 and 1502.14(a). This Draft EIS does not meet this fundamental mandate.

## IX. The Draft EIS Does Not Accurately Measure Traffic Impacts At The Western Terminus Of Klingle Road

The "Traffic Volume" discussion in the Draft EIS suffers from:
1. arbitrary selection of "peak" traffic periods, with a consequent understatement of peak traffic volumes
2. failure to provide model input and output data
3. failure to measure key intersections
4. numerous errors in the treatment of recorded data

### 1. Arbitrary Selection of Peak Traffic Periods

When The Louis Berger Group, Inc. performed the Wisconsin Avenue Corridor Study for the District's Department of Transportation, they collected traffic counts using mechanical tube devices over a one-week period. These devices enabled researchers to determine actual peak traffic periods for given intersections, including some intersections within the study area of the Klingle Road project. Researchers then conducted "turning movement counts" during the actual peak time periods identified by their measurements.

The Klingle Road Draft EIS, by contrast, used no mechanical vehicle counters and made no actual count of traffic volumes throughout the course of an entire day. Instead, the authors conducted a Travel Time and Delay Survey during arbitrarily selected and unduly long "peak" periods (i.e., 2 to 3 hour stretches of time) – without support or justification for the purported "peaks" and without regard to the actual peaks measured in the Wisconsin Avenue Corridor study. For example, the Draft EIS's 8 "PM peak" Travel Time and Delay Survey measurements for Woodley Road/Cathedral Avenue (from Wisconsin Avenue to Connecticut Avenue and vice versa) occur between 4:29 PM and 6:13 PM. Only 2 of these measurements occur during the PM peak (i.e., 5:15 to 6:15 PM) identified for the Wisconsin Avenue/Woodley Road intersection of this roadway in the Wisconsin Avenue Corridor study. Likewise, 8 of the Draft EIS's "AM peak" Travel Time and Delay Survey measurements for the same roadway occur between 7:49 AM and 9:43 AM. Only 5 of the 8 measurements occur during the AM peak (i.e., 7:45 to 8:45 AM) identified for the Wisconsin Avenue/Woodley Road intersection of this roadway in the Wisconsin Avenue Corridor study.

In fact, the Draft EIS does not even use the term "peak" consistently. Although the purported "AM peak" is supposed to extend through 9:30 AM, the 9:12 AM measurement on 5/13/04 for this intersection is erroneously characterized as a "mid-day" measurement. The 9:43 AM measurement on 5/12/04 is likewise erroneously characterized as "mid-day" even though it does not fall within any of the designated "peak" periods. (According to the arbitrary criteria adopted by the Draft EIS, the designated "AM peak" is supposed to end at 9:30 AM and the designated "mid-day peak" is not supposed to begin until 11:30 AM, making measurements at 9:43 AM invalid for any purpose.) DEIS, Vol. III, App. D.

The bias introduced by using "non-peak" travel times is illustrated by the Draft EIS's travel time measurements for Woodley Road/Cathedral Avenue from Wisconsin Avenue to Connecticut Avenue: regardless of the day, as the hour progresses (from 7:49 AM to 9:19 AM), travel times improve steadily. A driver traveling this roadway at 7:49 AM adds 37% to the travel time of a driver making the identical trip at 9:19 AM. Improved travel times later in the morning coincide with the decline in school-related traffic. Six schools with a total enrollment of close to 3,000 students lie on or within a 1 to 2 block distance of Woodley Road/Cathedral Avenue. All start before 8:45 AM, contributing a sizeable number of cars and, in some cases, vehicle queuing to area roadways. The schools, number of students,

32

and starting times (as provided by each school's admissions or administrative office) are listed below:

**Table 2: School-Related AM Traffic
(Woodley Road/ Cathedral Avenue)**

| Starting Time (AM) | School | Number of Students |
|---|---|---|
| 7:50 | St. Albans | 567 |
| 8:00 | National Cathedral | 575 |
| 8:15 | Maret | 600 |
| 8:15 | Washington International | 425 |
| 8:30 | Beauvoir | 387 |
| 8:45 | Eaton Elementary | 400 |
| **7:50-8:45** | **All Schools** | **2,954** |

The bias introduced by arbitrary "peak" periods goes beyond diluting "peak" travel times with faster "non-peak" travel speeds. It also misses traffic delays and queues during a significant, localized, non-rush hour peak: school dismissal time. All six Draft EIS "peak" mid-day Travel Time and Delay Survey measurements for Woodley Road/Cathedral Avenue (from Wisconsin Avenue to Connecticut Avenue and vice versa) occur between 9:12 AM (sic) and 1:30 PM. Actual Draft EIS "PM peak" measurements for this roadway do not start up again until 4:29 PM. This truncated survey misses the heavy traffic peak from 2:30 to 3:30 PM when close to 3,000 students are dismissed from the schools identified above into the roughly ½ square mile area surrounding Woodley Road/Cathedral Avenue. The schools, number of students, and dismissal times (as provided by each school's admissions or administrative office) are listed below:

33

**Table 3: School Dismissal Traffic**
**(Woodley Road/ Cathedral Avenue)**

| Dismissal Time (PM) | School | Number of Students |
|---|---|---|
| 2:00 – 2:30 | St. Albans (Upper)[29] | 316 |
| 2:50 | Washington International | 425 |
| 3:00 | Beauvoir[30] | 387 |
| 3:10 | Maret | 600 |
| 3:15 | National Cathedral[31] (Upper & Middle) | 435 |
| 3:15 | Eaton Elementary | 400 |
| 3:30 | National Cathedral (Lower) | 140 |
| 3:30 | St. Albans (Lower) | 251 |
| **2:00 – 3:30** | **All Schools** | **2,954** |

In addition to the student population identified in the above table, additional school dismissal traffic is generated by two other student groups. First, buses carrying students from other schools (including schools in Maryland and Virginia) arrive in the area during after-school hours for sporting events. Second, as noted earlier, 24 other schools surround the closed portion of Klingle Road and there are plans to relocate Rock Creek International School at the Saint Sophia Greek Orthodox Cathedral educational facility on Garfield Street directly across from the St. Albans School grounds, adding yet another sizeable group of students to this population.

In short, there are thousands of students in transit near the closed portion of Klingle Road during school dismissal time, yet none of this traffic entered into the Draft EIS's Travel Time and Delay Survey.

---

[29] School is dismissed at 2:00 PM on "non-chapel" days and at 2:30 PM on "chapel days," which occur about twice weekly. Students may attend study hall or leave campus until approximately 4:30 PM when most return for after-school sports.

[30] School is dismissed at 2:30 PM on Fridays.

[31] National Cathedral School has a total student population of 575 students; the distribution of students among the three divisions (i.e., upper, middle, and lower schools) may fluctuate from year to year. Lower school students are dismissed at 2:45 PM on Fridays.

34

2. <u>Failure To Provide Model Input And Output Data</u>

The Draft EIS fails to explain or justify its model choice, provide model input data (including such critical information as growth rate), or identify clearly how "peak hour" turning movement study results are used. (E.g., how are peaks in figures D-4 and D-5 calculated?)   In addition, diagrams of model results are illegible in Appendix D-7 (Travel Demand Model Results).

3. <u>Additional Errors and Omissions</u>

Finally, the Draft EIS contains numerous errors and omissions.  For example, the Draft EIS:

- fails to mention or address the 30,000 to 36,000 vehicles traveling along the Wisconsin Avenue boundary of the study area.
- fails to study traffic delays on heavily traveled 34th Street
- fails to study the terminus of Klingle Road at 34th Street
- fails to study other key intersections, including Woodley and Wisconsin, Garfield and Wisconsin, Garfield and 34th Strreets, Cathedral and 34th Streets, Cleveland and 34th Streets.
- erroneously puts numbers for two-way delay time in the column for one-way eastbound delay time and vice versa in Table D-10 (DEIS, Vol. III, App. D, p. 31).
- erroneously confuses results for one-way and two-way delays in the textual discussion (DEIS, Vol. III, App. D,  p. 43)
- fails to explain how a 20 mph speed limit on Klingle Road will be enforced absent a shoulder on the road and given the higher speeds observed on other area roads
- fails to contain page numbers for many of the pages in the two-volume Appendix D, making it difficult to provide specific comments on these pages.
- neglects to mention that Level E represents unacceptable LOS for unsignalized intersections (DEIS, Vol. III, App. D, p. 21)

35

- neglects to mention that WMATA metrobus lines also use Woodley Road in the introductory description of bus services (DEIS, Vol. III, App. D, p. 20).

## X. The Draft EIS Fails To Address The Adverse Impacts Associated With Parking Constraints During Construction Of The Proposed Road, Contrary to NEPA.

### A. The Draft EIS Fails To Study Parking Conflicts.

Common sense dictates that, in a city strapped for parking spaces, any major construction project will place additional, potentially unsupportable, demands on parking. The Draft EIS concedes as much:

> "Parking needs for workers' personal vehicles, trucks, and other construction equipment could have an adverse impact on local residents' parking needs." DEIS, p. 4-33.

Having made this concession, however, the Draft EIS makes no attempt to study the severity of, or solution (if any) to, the parking problems which will inevitably be created by construction of Klingle Road. Thus, the Draft EIS does not investigate:

a) inventory (i.e., the number of parking spaces physically located in the surrounding area);

b) parking restrictions (i.e., the extent to which use of available spaces is restricted by "residential permit/2-hour parking" signs, "no parking" zones, etc.);

c) existing demand (i.e., the degree to which existing spaces are already used);

d) violations (i.e., the extent to which illegal parking already occurs, blocking traffic lanes, impairing visibility at intersections, creating safety hazards, or consuming spaces meant for residential use); or

e) new demand (i.e., the number of parking spaces needed for project construction and the time of day these spaces are likely to be sought).

A parking survey along the lines outlined above is not an inherently difficult task; the Louis Berger Group analyzed parking inventory, restrictions, utilization/demand, and, to a lesser extent, violations for the area

36

extending 750 feet from the centerline of Wisconsin Avenue for DDOT in the Wisconsin Avenue Corridor Transportation Study Draft Report. WACTS Report, pp. 41-52. There is no reason why a similar study should not be done in the vicinity of Klingle Road.

Any parking study should also examine potential parking conflicts which may occur as a result of:

- planned development at local private, educational, and religious sites (the Draft EIS erroneously claims there is no such development);
- growth in nearby commercial areas (the Draft EIS fails to address the implications of the recently issued Wisconsin Avenue Corridor Transportation Study, among others);
- extraordinary event-related demands (E.g., area school fairs, events at Twin Oaks, Washington National Cathedral, and the National Zoo, and conferences at area hotels as far away as Calvert Street and Connecticut Avenue have been known to cause parking jams on Klingle and Woodley Roads and 32nd Street. Due to the high number of institutions in this area, event-related parking demands occur frequently.); and
- post-construction, induced travel attributable to a new road (the Draft EIS fails to address this issue also).

## B. The Parking Mitigation Measures Identified in the Draft EIS Are Wholly Illusory.

In the absence of any actual data collection, the Draft EIS gives short shrift to adverse parking impacts, reciting a (brief) laundry list of mitigation measures that one might find in a quick literature search (though, tellingly, never committing to employment of any such measures). The listed mitigation measures encompass three potential techniques: signage, scheduling, and staging. However, these proposed mitigation measures are wholly illusory, given the physical constraints of Klingle Valley and the surrounding area.

### 1. Extra Signage Is Not Adequate Mitigation; It Does Not Address The Lack Of Available Parking Spaces For Construction Workers And Equipment.

37

First, the Draft EIS proposes that parking mitigation include "Extra signage … to reduce confusion." This begs the question. Extra signs cannot create spaces that simply do not exist. The Draft EIS blithely assumes there are parking spaces to be had at either terminus of the proposed roadway. This assumption is patently false; had the Draft EIS included an inventory of parking spaces, it would have recognized there are no readily apparent parking locations at the Beach Drive terminus of Klingle Road.

At the opposite end of the proposed road (i.e., the Klingle Road/Woodley Road/32nd Street terminus), virtually all of the area is designated either "No Parking Any Time" or "Two Hour Parking Limit in Zone 3, 7 AM to 8:30 PM, Zone 3 Permit Holders Excepted." Streets wholly restricted by such designations include Woodley Road from Cathedral Avenue to 35th Street and from 36th to Wisconsin Avenue, 32nd Street from Woodley Road to Garfield Street, Cathedral Avenue from 29th Street to 31st Street, and Klingle Road from the park exit to its terminus at 34th Street (with the exception of one small, unrestricted stretch on the north side of Klingle from the driveway of Washington International School to Woodley Road).[32] On a typical weekday, the latter stretch currently yields virtually no unused parking spaces; it would appear these spaces are almost entirely consumed by students, faculty, and staff of the three immediately adjacent schools: Maret, John Eaton, and Washington International School. Unless workers are limited to two-hour shifts, therefore, there are no additional available parking spaces to be had at the western terminus of Klingle Road.

## 2. A Staging Area for Trucks and Equipment Does Not Appear To Be A Viable Mitigation Measure Here.

Second, the Draft EIS proposes creation of "a staging area within the work zone" to "provide parking for trucks and construction equipment." DEIS, p. 4-33. However, the Draft EIS does not identify a physical location for a staging area. Since the area surrounding Klingle Road largely consists of private land or roads used for residential access and egress, it is difficult to conceive where a staging area could occur – unless the District intends to

---

[32] An additional small triangle of ground formed by the intersection of Klingle Road, Woodley Road, and 32nd Street, originally designated "Two Hour Parking," is not currently posted as such. Here,"Two Hour Parking" signs were removed during construction and repaving on Woodley Road and have not yet been replaced. However, on a typical weekday, this small stretch, too, is usually filled with cars – indeed, sometimes so crammed full that drivers ignore city-wide legal limits on parking too close to the intersection, obscuring intersection visibility.

38

use National Park Service lands. If so, the Draft EIS should discuss this fact and identify the legal authority supporting such use of a national park. If there is no possible site for a staging area, the Draft EIS should delete this suggestion from its list of possible mitigation measures. In any event, a staging area for trucks and construction equipment does not solve the problem of parking vehicles for workers and inspectors.

### 3. Adjustments To Construction Schedules Cannot Reduce Conflicts With Existing Parking Demands

Finally, the Draft EIS suggests traffic impacts can be mitigated simply by shifting construction work schedules. These suggestions are either not credible or, to the extent they are arguably feasible, create serious, unstudied safety problems as outlined below.

### (i)    AM Conflicts

The Draft EIS purports to minimize AM traffic conflicts by starting construction early in the day:

> "Work schedules for construction could be adjusted to minimize adverse impacts to local traffic. Workers would arrive before the morning rush hour." DEIS, p. 4-33.

In a completely contradictory suggestion, the Draft EIS then states:

> "The time period during which workers would need parking spaces would generally coincide with the times local residents are away at work, minimizing adverse impacts to local parking requirements." DEIS, p. 4-33.

This proposal is not workable for two reasons. First, the weekday morning "peak" traffic period, according to the Draft EIS, begins at 6:30 AM. DEIS, Vol. III, App. D, p. 12. However, construction in residential areas of the District of Columbia cannot legally start before 7:00 AM. Are construction workers on the Klingle Road project supposed to arrive well in advance of 6:30 AM and remain idle until 7:00 AM (and, if so, has this been factored into construction costs)? Second, how can workers use spaces purportedly vacated by commuters if the workers arrive before commuters leave for work? The only way AM project/resident conflicts can be avoided

39

is by having construction workers arrive <u>after</u> the AM "peak" travel time, defined by the Draft EIS as 9:30 AM. DEIS, Vol. III, App. D, p. 12.

### (ii)    PM Conflicts

The Draft EIS next suggests, "In the afternoon, workers would typically leave after school lets out and before the evening rush hour." DEIS, p. 4-33. However, as noted earlier, the Draft EIS never studied local school dismissal times. Had it done so, the authors would have realized the difficulty with this proposal.

The Draft EIS defines the weekday PM "peak" travel time as commencing at 3:30 PM. DEIS, Vol. III, App. D, p. 12. School dismissals, as detailed above, commence at 2:00 PM and continue until 3:30 PM. Are construction workers on this project supposed to depart by 1:30 PM so as not to be on the roads when students start leaving school? If so, this departure, combined with the 9:30 AM start time discussed above, would leave an abbreviated 4-hour workday. If this is what the Draft EIS intends, the impact on construction costs and schedules should be clearly identified in the Draft EIS.

### (iii)    Mid-day Conflicts.

Finally, the Draft EIS purports to avoid peak hour travel conflicts by shifting construction practices:

> "Whenever possible, deliveries and other construction activities would take place during off-peak travel hours." DEIS, p. 4-33.

As outlined above, off-peak hours are defined by the Draft EIS as the period between 9:30 AM and 3:30 PM. Compressing heavy truck and equipment movement into these hours increases the likelihood that construction vehicles will be on the roads at the very hours most area students are likely to be on the roads (i.e., mid-day from 2:00 to 3:30 PM). Unless DDOT intends to further compress the delivery period, curtailing deliveries after 2:00 PM, the Draft EIS should identify this safety hazard.

In either case, the Draft EIS should not hide behind the vague "whenever possible" language of this purported mitigation measure. Construction of a public road occurs pursuant to a government-initiated

contract. If deliveries are not to take place during specified hours, this should be specified in the terms of the contract, and the concomitant impacts on construction costs and time schedules included in the Draft EIS. If deliveries are not to be so restricted, this proposed mitigation measure is illusory and should be deleted from the Draft EIS.

## XI. The Draft EIS Fails To Comply With Applicable Federal Floodplain Management Laws.

Most of Klingle Creek is channelized to allow for the existence of Klingle Road, which traverses a steeply sloped part of Klingle Valley parallel to, and in close proximity to, the creek – indeed, zig-zagging across the creek in three locations. DEIS, Figure 1-3, p. 1-7 and 3-29. In fact, the road and stream are so proximate that pieces of the eroded road now form part of the substrate of Klingle Creek. DEIS, p. 3-29. Approximately half of the currently closed portion of Klingle Road lies within the 100-year floodplain. DEIS, pp. 3-31, 4-26 and Figure 3-10, p. 3-32.

Construction of the proposed roadway, therefore, falls under the purview of the Flood Disaster Protection Act of 1973, which prohibits Federal actions in areas subject to flooding, and Executive Order 11988, Floodplain Management (May 24, 1977). The latter Executive Order requires Federal agencies to take action to reduce the risk of flood loss; to minimize the impact of floods on human safety, health, and welfare; and to restore and preserve the national and beneficial values served by floodplains. DEIS, p. 4-22. The Executive Order applies whenever Federal agencies manage and dispose of Federal lands, as the Draft EIS acknowledges, and also, as here, when such agencies are "providing Federally undertaken, financed, or assisted construction and improvements, and conducting Federal activities and programs affecting land use, including, but not limited to, water and related land resource planning, regulating, and licensing." (E.O. 11988, Sect. 1.)

The Order requires each agency "to evaluate the potential effects of any actions it may take in a floodplain; to ensure that its planning, programs, and budget requirements reflect consideration of flood hazards and floodplain management (emphasis added)." Where an EIS is prepared, this evaluation must take place in the EIS itself.

41

Therefore, to "conduct, support, or allow" activity in a floodplain, a federal agency must undergo a four-step analysis, the results of which must appear in the EIS:

1.    First, the agency "shall consider alternatives to avoid adverse effects and incompatible development in the floodplain."

2.    Next, the <u>head of the agency</u> must find that the proposed action is "the <u>only practicable alternative</u> consistent with the law and the policy set forth in [the Executive Order]."

3.    Third, the agency must "design or modify its action in order to minimize potential harm to or within the floodplain consistent with [applicable regulations]."

4.    Finally, the agency must prepare and circulate a notice: a) explaining why the action is to be located in the floodplain, b) stating whether the action conforms to applicable state or local floodplain protection standards, and c) listing all alternatives considered. <u>Whenever practicable, construction shall be elevated above the base flood level rather than filling in land.</u>

The Draft EIS utterly fails to meet these standards. As noted earlier, the Draft EIS fails to consider any of several promising non-road alternatives to the proposed roadway. The Draft EIS does not contain any findings by the head of either the Federal Highway Administration, as lead agency, the National Park Service, as cooperating agency, or the U.S. Army Corps of Engineers or the U.S. Environmental Protection Agency, as permitting agencies – indeed, it is hard to conceive how this road, which parallels several existing roads and which was so inconsequential to public transit that it remained closed with no apparent harm to adjacent neighborhoods for 14 years, could be "the only practicable alternative" for east-west access across the park. Finally, the Draft EIS does not contain any of the required mitigation, engineering and construction, and public notice measures, nor does it even consider, much less ensure, road elevation rather than filling in land.

The Draft EIS offers a one-sentence explanation for these omissions:

"Since all the Build Alternatives would occur on the existing Klingle Road alignment and follow the same road configuration, there would be no new impact on the floodplain or flood levels." DEIS, p. 4-26.

42

If this cryptic comment is meant to imply that floodplain management requirements apply only to new, not replacement roads, the suggestion is absurd. Executive Order 11988 explicitly refers to "improvements," "rehabilitation," "action," "financ[ing]," "support," "assist[ance]," "manage[ment]," "regulating," "licensing," "planning," and "allow[ing] an action," in addition to construction. The Executive Order also refers simply to "construction," without specifying that the construction must be "new" or have "new impact."

In any event, building a new roadway, even one that follows the original alignment of an eroded old roadbed, will have considerable "new impact." In addition to construction impacts, the proposed project would place new roadbed and road surfacing material in the floodplain, creating the risk that this material, too, will wash away into parkland and stream as much of the prior roadbed did. (See, e.g., Figures 3-9 and 3-18, DEIS, pp. 3-28 and 3-66.) Second and more importantly, the proposed road reopening in 2007 would add vehicular traffic to the area for the first time in 16 years: an estimated 3,850 vehicles per day over the current "closed roadway" situation and an estimated 650 vehicles per day over traffic volume in 1991 when this roadway last carried vehicular traffic. DEIS, p. 4-34 and 3-34. By 2027, vehicular traffic is projected to rise to 5,000 vehicles daily. DEIS, p. 4-34. New traffic poses new risks to human health and safety, since each of the motorists traversing Klingle Road during or after storms would be exposed to the risk of flooding, road disintegration, and flood-related accidents. These are precisely the adverse effects Federal floodplain management requirements are designed to avoid.

To comply with federal law, the Draft EIS should undertake a serious evaluation of Federal floodplain management requirements, including considering whether several of the promising non-road options would restore and preserve floodplain values by removing the need to channelize Klingle Creek altogether. This is the option recommended by the District Department of Health:

> "The continuing impacts of stream channelization from the original road construction have been mistakenly assumed to be baseline conditions. The stream is trying to re-establish a stable meandering channel configuration by severely eroding the channelized banks and

43

fish are reestablishing meaningful populations since the road has been closed."[33]

As that agency explained:

"Approximately half of the currently closed portion of Klingle Road is within the 100-year floodplain. This area has already been historically altered through the placement of stream bank retaining walls. Under all [build] alternatives, the floodplain would be altered to repair these retaining walls…. However, this simply re-channelizes the stream and re-establishes a hostile environment to biological re-colonization…. [By contrast], Klingle Road area as a 'green space' would provide additional habitat for wildlife and will provide a buffer for the stream."[34]

## XII. The Draft EIS Fails To Address The Ongoing Water Pollution Impacts Which Would Be Created By Rebuilding Klingle Road.

As noted earlier, Klingle Road lies in close proximity to Klingle Creek, crossing the creek in three locations. DEIS, Figure 1-3, p. 1-7 and 3-29. In fact, the road and stream are so proximate that pieces of the eroded roadbed now form part of the substrate of Klingle Creek. DEIS, p. 3-29.

Common sense dictates that vehicular traffic on a road so close to a streambed would cause ongoing adverse water quality impacts in the stream as well as adverse impacts to groundwater in the vicinity of the stream. The Draft EIS acknowledges as much:

"After construction is completed, normal operation of the road itself would have some adverse impacts to the water quality of Klingle Creek and Rock Creek…. Impacts to groundwater quality could occur as a result of infiltration of road related chemicals in runoff from Klingle Road." DEIS, pp. 4-27 and 4-29.

---

[33] Later dated July 13, 2001 from Theodore J. Gordon, Chief Operating Officer, DC Department of Health, to Dan Tangherlini, Acting Director, DC Division of Transportation. (Although these comments were submitted in response to a draft "Alternatives Analysis," they apply as well to the Draft EIS, which fails to address the core concerns expressed in this letter.)

[34] Id.

44

The Draft EIS, however, makes no effort to study, quantify, or describe these negative impacts nor does it attempt to explain the significance of these effects to the environment. Instead, the Draft EIS merely punts on the instream impacts:

"Precipitation that falls on roadways and runs off into stormwater sewers can carry many pollutants that can impact water quality, such as sediments, oil, grease and toxic chemicals from motor vehicles, and road salts." DEIS, p. 4-27.

The document dismisses groundwater impacts as "minimal" without analysis or apparent evidentiary support. DEIS, p. 4-29. Since the document identifies no specific impacts, it summarily concludes "no mitigation measures would be needed...." DEIS, p. 4-29.

NEPA regulations specify that an EIS must discuss "Direct effects *and their significance*" as well as "Indirect effects *and their significance.*" 40 CFR 1502.16 (a) and (b)(emphasis added). This discussion must be "full and fair" – indeed "rigorous." 40 CFR 1502.1 and 1502.14. Agency statements "shall be supported by evidence that the agency has made the necessary environmental analyses." 40 CFR 1502.1. The discussion must be scientific and analytical, not merely hypothetical:

"Agencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements. They shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement." 40 CFR 1502.24.

The Draft EIS's treatment of water quality impacts does not meet these NEPA requirements or even minimal standards of professionalism. The District's own Department of Health castigated a similarly curt draft analysis at an earlier stage of environmental assessment as wholly inadequate; their comments have yet to be addressed in this Draft EIS:

"The document as it is currently written, does not provide any substantial quantified evaluation of the impacts of the different alternatives on water quality, air quality, vegetation, fish and aquatic life. There is a large amount of data available concerning pollutant loads from vehicular traffic and none of it has been used to estimate

45

the pounds of pollution that would be introduced into the stream under the different alternatives. There is no discussion as to whether each alternative would contribute to the water quality standards violations. The Department of Health has to perform a TMDL for the stream for toxics and the reintroduction of vehicular traffic may create additional loads of toxics."[35]

The Department outlined what a professional analysis would encompass:

"A complete alternatives analysis would be expected to include a breakdown of each option with expected levels of physical, chemical, and biological impacts imparted by the implementation of a particular alternative. Impacts considered should include: construction and long term sediment erosion levels, mature tree loss, loadings of automobile toxics contaminants from water and air, loadings of nutrient and biological contaminants from pets, and noise. Each of these impairments should be looked at closely and related to current and potential effects to the physical and biological integrity of the Klingle stream and valley. Additionally, influences on the Rock Creek tributary to the Potomac River should be considered."

Conduct of such a study is entirely feasible; indeed, the DC Department of Health recommended that an environmental analysis do precisely that:

"There are a number of small tributaries to Rock Creek that do not have roads adjacent to them and they could be used to provide a baseline upon which to evaluate different alternatives and their impacts. There are also tributaries similar to Klingle that have roads next to them and can be used for comparisons."

The unstated assumption permeating the Draft EIS is that if the District takes one "good" action for the environment (i.e., making some improvements in stormwater management in Klingle Valley, however

---

[35] Letter dated July 13, 2001 from Theodore Gordon, Chief Operation Officer, Department of Health, to Dan Tangherlini, Acting Director, DC Division of Transportation. In an accompanying Attachment, DOH added that the analysis contained: "no substantive or quantifiable information defining the relative impacts each alternative would have on the stream related to stormwater and sediment erosion. In this respect the study is inadequate and cannot be considered a full analysis of the primary problem affecting the stream and to what extent each alternative would influence the stream and valley."

46

inadequate) it is then relieved of the obligation to take other water quality responsibilities. Neither NEPA nor the Federal Clean Water Act are "cafeteria plans;" they do not countenance such "bait and switch" tactics.

For that reason, the Draft EIS is seriously deficient in not informing the public or government policymakers of the District's legal obligations with respect to this stream under the Federal Clean Water Act. The latter statute mandates that all waters of the United States meet applicable water quality standards, 33 U.S.C. 1311-1315; it requires municipal stormwater discharges, in particular, to obtain permits designed to meet applicable water quality standards and achieve "maximum practicable" pollutant reductions. 33 U.S.C. 1342(p). The Act expressly prohibits "backsliding" with respect to applicable water quality prohibitions. 33 U.S.C. 1342(o). Violators of these provisions can incur costly civil – in some cases, criminal – penalties as well as risk liability under citizen suits. 33 U.S.C. 1319 and 1365. The Draft EIS has not disclosed these legal obligations, discussed their applicability to Klingle and Rock Creeks, or revealed the extent to which reopening Klingle Road would reduce compliance options (for example, eliminating space for stormwater detention and treatment) and/or force the District to employ more costly compliance measures. This is a serious failure which undercuts the very purpose of an EIS.

In addition, DC's EPA-approved water quality standards designate Rock Creek and its tributaries as Special Waters of the District. For waters so designated, the regulations prohibit any "long term adverse water quality effects." 21 DCMR1102.4(b).

The Draft EIS simply writes off Klingle Creek: its water quality is "fair to poor," the U.S. Environmental Protection Agency has designated it "100 percent impaired" for Aquatic Life Support, Primary Contact (Recreation) and Secondary Contact (Recreation), and, according to the Draft EIS, "Existing conditions in Klingle Creek are not representative of a small, healthy urban stream." DEIS, p. 3-24. The Draft EIS implies that this is a permanent, unremediable situation:

> "The level of development in the Klingle Creek watershed and surrounding area has limited the ability of the creek to effectively drain the watershed…." DEIS, p. 3-24.

However, the Department of Health, the agency responsible for ensuring the District's compliance with Federal Clean Water Act requirements, has a much rosier assessment of Klingle Creek's future. The Department of Health characterized Klingle Branch as "a functional yet fragile ecosystem that serves as a valuable tributary of Rock Creek."[36] Fragility is an issue "because of the invasive construction that has already taken place in an attempt to keep the creek within its banks during high water construction."[37] With proper restoration, Klingle Creek has significant potential to improve:

> "Once rehabilitated, the Klingle Valley watershed has promise to hold many more species. Even with the degraded nature of the stream, the Department of Health found three species of fish including blacknose dace, American eel, and the bluntnose minnow, and wildlife species include the ubiquitous grey squirrel, and birds such as the piliated woodpecker, and starling…. By first reducing the amount of impervious asphalt, and properly managing storm water runoff, work can then begin on the stabilization of the steep slopes leading down to the stream. Controlling erosion of the steep stream valley slopes will allow the recovery of the stream by flushing out some of its built-up sediment load…. Restriction of automobile vehicle traffic will increase the viability of wildlife species in the watershed…. Once the stream begins to recover, fish and wildlife will return from other areas of the Rock Creek Park system. The stream will be able to return the favor, if the mainstem of Rock Creek is ever again negatively affected by pesticides, or accidental inputs of chlorinated water as has happened in the past…. Restoration of the Klingle Valley Tributary watershed will ultimately be beneficial to the wildlife found in this watershed and all the wildlife found throughout Rock Creek."[38]

The difference between which of these two futures – bleak or rosy – prevails may lie in whether Klingle Road is reconstructed. As DOH observed, "[T]he most obvious potential impact that threatens the Klingle Branch ecosystem was the presence of Klingle Road, which meanders alongside the natural contour of the stream."[39] Permanent closure of Klingle

---

[36] Letter dated January 22, 2001 from Ward 3 Councilmember Kathy Patterson to Mayor Anthony A. Williams, citing a relevant DOH Environmental Health Administration report.

[37] Id.

[38] "Klingle Valley Tributary: Environmental Analysis."

[39] Letter dated January 22, 2001 from Ward 3 Councilmember Kathy Patterson to Mayor Anthony A. Williams, supra.

48

Road to vehicular traffic would have a twofold benefit. First, this option would eliminate sources of pollutants associated with motor vehicle runoff. Second, permanent closure of Klingle Road may also solve stormwater pollution problems. The District Department of Health observed:

> "Stormwater must be controlled for pollutant content and flow. There must be sufficient storage to contain all storm water from the road surface and provide a treatment and slow release. This essentially requires that major parts of the road be dug up because the only area available for storage is the road right of way."[40]

The Draft EIS concedes, "In the event sufficient land was available, the Klingle Creek study area would be a good candidate for the implementation of new detention facilities." DEIS, Vol. II, App. A, p. 5-1. Rather than identifying such facilities as an alternative, non-road use of Klingle Valley land, however, the Draft EIS ignores the land availability problem, vaguely suggesting there are two possible land sites which could be explored for stormwater detention purposes at some unspecified future date. Both sites constitute pie-in-the-sky solutions. First, the Draft EIS suggests use of the Tregaron property for stormwater detention:

> "The Tregaron National Registry property has been identified as one potential location at which there is sufficient non-developed land for a large detention facility to be constructed." DEIS, Vol. II, App. A, p. 5-1.

The District, however, does not own the Tregaron land. It would have to purchase or lease the land, yet the Draft EIS fails to disclose the potential costs of doing so. Nor does the Draft EIS address how such use of the land would be compatible with planned development at this site.

Next, the Draft EIS looks to future road repair projects:

> "DDOT has identified several future paving projects that will be performed within the Klingle Road study area.... When these paving projects are initiated, DDOT has stated that they will evaluate each project to determine its suitability for adding an underground

---

[40] Memo dated August 30, 2001 from James Collier, Chief to Cynthia Harris and Ted Gordon re: Klingle.

49

detention structure to reduce stormwater flows entering Klingle Creek." DEIS, Vol. II, App. A, p. 5-2.

At this point, the suitability of any future road repair projects for solving stormwater problems is purely hypothetical. In any event, even if future projects provide technically feasible solutions, this begs the question. How much will it cost to provide stormwater detention at these other projects and how do those costs compare to the cost of current, non-road alternatives for Klingle Valley? Without this information, policymakers may choose to build Klingle Road now, only to incur substantially higher stormwater management costs in the future. This type of information is precisely what an EIS is to supposed to provide to decisionmakers; without this information, the Draft EIS is a hollow exercise.

In short, NEPA mandates:

"Environmental impact statements shall state how alternatives considered in it and decisions based on it will or will not achieve the requirements of [NEPA] and other environmental laws and policies." 40 CFR 1502.29(d).

The Draft EIS utterly fails to meet this mandate with respect to Federal and District water quality laws and policies.

## XIII.  The Draft EIS Does Not Present Sufficient Information To Allow Adequate Public Comment On The Stormwater Analysis.

NEPA requires that agencies make "diligent efforts to involve the public" in the EIS process. 40 CFR 1506.6. There is no room under NEPA for agencies to hide the ball. Agency statements to the public must be informative, present a "full and fair" discussion of issues, employ "rigorous" analysis, and identify methodologies and sources. 40 CFR 1502.1, 1502.14, and 1502.24. The Draft EIS does not meet these standards; its presentation of stormwater information is vague, cursory, and conclusory, defying meaningful public comment. For example, the Draft EIS fails to supply critical information on its choice of models, model inputs, safety and contingency factors (if any), control plans for large storm events (if any), "first flush" controls (if any), technical feasibility analysis (if any), and the basis for its cost calculations. DDOT should revise the stormwater analysis

and resubmit the revised version for public comment before preparing a final EIS. We explain each of the seven major problems with the analysis below.

## 1. Choice of model

The Draft EIS has not explained or justified its choice of either the TR-55 or HEC-RAS models for the stormwater analysis. The TR-55 model, in particular, employs the concept of a design storm (i.e., a synthetic storm which assumes uniform rainfall over a 24 hour period). EPA has criticized the model, noting that it may not adequately account for short duration, high volume storms in the context of a small, urbanized, steeply sloped watershed, like Klingle Valley:

> "The assumption made in single storm models is that the return period of the peak discharge is the same as the return period of the design rainfall event and that the watershed parameters are invariant with return period rainfall. <u>Studies have shown that constant watershed parameters are not a good assumption</u>." (Emphasis added.)[41]

Continuous simulation models, by contrast, capture some of the variability that could occur in input parameters. EPA has said such models "are better at predicting the accumulation and washoff of pollutants and the inter-arrival time between storms that can have a significant impact on the removal performance of the BMP."[42] Where, as here, an urban stream has water quality and habitat issues, continuous simulation has advantages over a design storm model like the TR-55:

> "Continuous simulation offers possibilities for designing and managing BMPs on an individual site-by-site basis that are not provided by other widely used, simpler analysis methods. Therefore its application and use should be encouraged."[43]

Therefore, EPA recommends a <u>combination</u> of a design storm and a continuous simulation model for designing BMPs:

---

[41] "Stormwater Best Management Practice Design Guide, Volume 1: General Considerations," prepared by the U.S. Environmental Protection Agency Office of Research and Development, September 2004, p. 4-11.
[42] Id. at p. 4-13.
[43] Id. at pp. 4-13 to 4-14.

51

"Limiting water quality analysis to design storms will not sufficiently address the smaller storms that carry a majority of the annual pollutant load. On the other hand, relying solely on continuous simulation may not capture the most severe peak flow events. Therefore, a combination of approaches may be required: continuous simulation for water quality analysis and design storm approach for determining peak flows and flood analysis. Resolution of conflicting results between both approaches may require implementing more than one type of BMP."[44]

The Draft EIS has not explained or justified its departure from EPA's modeling advice.

### 2. Model inputs

The Draft EIS does not identify the model inputs, only the model results. However, the value of the results depends entirely on the accuracy and quality of the inputs. E.g., the Curve Number (CN) is a key factor in the TR-55 model analysis. (The higher the CN, the more runoff the model will predict for an area.) The Draft EIS does not identify what CN was used, nor how the number was derived. What amount of impervious surface area was assumed? How was this amount calculated? Was the calculation based on current impervious surface area (if so, was this calculated before or after recent severe road erosion in Klingle Valley)? Alternatively, was impervious area based on expectations of new road construction; if so, what road configuration among the proposed alternatives was used? Similarly, what hydrologic soil groups and cover descriptions were used in assigning the CNs? Will these be expected to change with future development (e.g., that now under consideration for the Tregaron property or at Washington International School)? In addition, what piping configuration, volume of water, velocity, and duration was used? What specific rainfall information was used – from what weather station? During what time period? With what resolution (i.e., monthly, daily, hourly)?

Likewise, for the HEC-RAS river model, what flow duration curve was used to estimate the stream's response to storms? How was the model verified? The flow duration curve is very site-specific; however, use of the model is not supportable without verification.

---

[44] Id. at p. 4-14.

To comply with NEPA, DDOT should release all input and output files, along with a description of each file, and allow additional time for public comment on this essential information.

### 3. Safety factors

The Draft EIS does not indicate whether any safety factor was included in determining the peak runoff flow for each subwatershed. Such a factor could account for variability in assumed versus actual conditions, allow room for some level of future development in the watershed, and provide some protection against modeling errors. The Draft EIS should employ a reasonable safety factor and describe, explain, and justify that factor.

### 4. Consideration of large storm events.

The Draft EIS states that stormwater measures will be devised to allow only 2-year flows in Klingle Creek. The Draft does not clearly explain, however, what will happen during the increased rainfall associated with 10 and 25-year storms. What volume of water will be detained and where will detention occur? What percentage of water will be assumed to constitute overland flow during these heavier storms and how does that differ from the 2-year storm scenario?

In addition, since half of Klingle Creek lies within the 100-year floodplain, Federal floodplain management requirements apply, as we discussed in detail above. But the Draft EIS only modeled stormwater associated with 2, 10 and 25-year storms. EPA has stated that the 100-year design storm is the event used for purposes of flood control protection from major storms as well as to maintain the 100-year floodplain.[45] The Draft EIS should also model the water volumes during a 100-year storm and discuss the stormwater management techniques necessary to handle these larger water volumes, especially given the severe topography and past history of erosion of Klingle Valley.

### 5. First flush controls.

---

[45] "Stormwater Best Management Practice Design Guide, Volume 1: General Considerations," prepared by the U.S. Environmental Protection Agency Office of Research and Development, September 2004, p. 4-16.

"First flush" refers to the tendency for solids and other urban road and ground contaminants to be washed off paved areas during the initial portion of a storm event. First flushes may be lower in overall volume, but are generally more highly polluted than other storm runoff. Given the higher pollutant content of first flushes, the primary water quality objective for these waters is pollutant treatment or removal. Pollutants of concern include solids, heavy metals (e.g., zinc, copper, and lead), pesticides, fertilizers, and chemicals associated with automotive traffic. Treatment technologies can include settling, filtering, and cation exchange, among others. The Draft EIS does not even discuss, much less give attention to, the management of first flushes.

6. <u>Technical feasibility of "drop structure" velocity reduction controls</u>.

   a. Location of placement.

The Draft EIS states that "drop structures" will be used to reduce water velocity flowing through storm sewers, but does not explain how these will work. The land surrounding Klingle Creek is steeply sloped; bank slopes range from 6 to 150% on the left bank and from 1 to 75% on the right bank. DEIS, Vol. II, App. A, p. 3-4. To achieve velocities in the mid-20 ft/s range, the Draft EIS calls for storm sewer pipes to be laid at a 3 to 3.5% slope. DEIS, Vol. II, App. A, p. 3-22. As the Draft EIS concedes, "numerous drop structures" would have to be placed at "short distances" to achieve a 3% sewer slope. The Draft EIS has not addressed whether it is physically possible to accomplish this result in such a small space. Where and how will these gradations be built? Will diversion chambers be necessary? The Draft EIS does not, and should, provide a design drawing.

   b. Depth of placement

At what depth will the drop structures/diversion chambers need to be placed? Is there sufficient depth to bedrock at these locations or will construction involve blasting? If so, the Draft EIS should identify blasting as an adverse impact and study the effect of blasting on the historic structures and older, plaster-walled homes on the surrounding land.

54

In any event, the depth of excavation will influence the volume of material that needs to be removed and, hence, both the cost of removal and the construction damage to Klingle Creek. All of these issues should be addressed in the Draft EIS.

c. Effectiveness of controls.

Since placement of "drop structures" to achieve slope reductions of the magnitude called for here is, at best, an unusual construction technique, what evidence does the Draft EIS have that such close placement of these structures will work? Is the Draft EIS relying on some demonstrated technological application of drop structures; if so, where have these drop structures been used, how closely were they placed, and how effective have the structures proven to be? Alternatively, is the Draft EIS assuming that close placement of drop structures constitute either a new technological application or "transfer technology" (i.e., a modification or adaptation of other applications)? If so, the Draft EIS should provide the basis for these assumptions.

d. Costs of controls

How many drop structures or other velocity mitigation measures (e.g., diversion chambers) were included in the cost calculations? What depth of excavation did such calculations assume?

7. <u>Overall Cost Calculations.</u>

The Draft EIS provides only summary cost calculations. What design storm was used for the calculations? What pipe lengths and sizes (i.e., 48" to 54") were used? Do cost calculations assume a contingency factor and, if so, what factor? Do roadbed removal estimates address whether roadbed materials and associated debris are hazardous or otherwise necessitate special removal or disposal requirements? (More detailed cost information is also needed for road construction costs as well; the Draft EIS again provides only bottom-line, conclusory cost totals without supporting rationale.)

**XIV. The Stormwater Analysis in The Draft EIS Ignores Key Environmental Concerns Which The District Must Address As A Matter Of Federal Law.**

The stormwater analysis portion of the Draft EIS appears wholly centered on controlling runoff volume and direction, preventing erosion, and maintaining stream channelization – all aspects of stormwater management which, if properly handled, may allow a road to be built through Klingle Valley. By contrast, the Draft EIS does not seriously consider other key water quality aspects of stormwater management – such as floodplain management, pollutant removal, and groundwater recharge, which are key determinants of the health and aquatic diversity of receiving streams. In short, the Draft EIS relies solely on peak discharge control through a series of outlets which, if successful, "will only allow 2-year flows in Klingle Creek." DEIS, Vol. II, App. A, p. 4-4.

EPA has criticized such control strategies because the assumptions involved "do not hold up under scientific scrutiny and have never been validated by field monitoring." Indeed, EPA has said that the 2-year design strategy as a means to prevent channel instability and erosion to decrease sediment transport, and to protect habitat "is flawed…[I]t results in more erosion over the storm duration which subsequently results in wider and deeper channels…. Geomorphic theory and limited field monitoring indicate that this strategy does not work."[46]

In short, EPA has concluded such strategies are not adequate to meet Federal legal requirements:

> "Peak discharge control strategies … appear unable to meet the objectives of the CWA [Clean Water Act], the Pollution Prevention Act, the Source Water Protection Act and the habitat protection objectives of the ESA [Endangered Species Act]. The peak discharge control strategies are not capable of addressing the prevention or reduction of a number of hydrologic, hydraulic, and chemical parameters that influence the ecological integrity of receiving waters, especially with respect to habitat and biological parameters."[47]

The Draft EIS does not identify or address this criticism of its stormwater control plan. Nor does it evaluate measures which could supplement new storm sewer pipes to achieve water quality and ecological concerns. The Best Management Practices discussion in the Draft EIS is

---

[46] Id. at pp. 4-15 to 4-16.
[47] Id. at p. 4-14 to 4-15.

largely a "quick and dirty" literature search designed to show the hypothetical existence of some stormwater BMPs; the discussion does not seriously address the effectiveness, applicability, or feasibility of these practices to Klingle Valley. At least one of these BMPs (i.e., minimization of land disturbance), is directly at odds with the Draft EIS's preferred alternative, construction of a road. Another, asking residents to put out "rain barrels," is identified as a potentially useful strategy, but there is no accompanying analysis of its cost or feasibility in holding back the volume of water that needs to be detained in Klingle Valley. (See DEIS, Vol. II, App. A, p. 5-3),

Earlier in these comments, we showed why the stormwater detention facilities mentioned in the Draft EIS are merely pie-in-the-sky if the District uses the land in Klingle Valley for a road instead of for stormwater management purposes. The other BMPs mentioned in the Draft EIS (see DEIS, Vol II, App. A, pp. 5-1 to 5-4), suffer from the same defect: constructed or vegetated swales, constructed wetlands, bioretention facilities, infiltration trenches or basins, and filter strips all require land. Without a road, Klingle Valley could supply that land; with a road, one is hard put to conceive where such land could be found. NEPA (as well as the other Federal laws cited above) require the EIS to address this conflict.

## XV. The Draft EIS Does Not Address The Impact Of The Proposed Road On Development In The Project Area, Contrary To NEPA.

The Draft EIS blithely surmises the proposed road will not assist developers:

> "[T]here are no proposed or existing developments in or adjacent to Klingle Valley in which the implementation of any of the proposed alternatives would assist with future development or enhancement of these resources." DEIS, p. 1-21.

This statement is flat out wrong. At a community meeting on July 12, 2005, Craig Curtis, an architect with the Miller Hull Partnership, and Patricia O'Donnell, a planner with Heritage Landscapes, briefed the neighboring community on the Tregaron Limited Partnership's plans to develop 14.6 acres of property owned by the latter partnership on the former Tregaron estate. The plans include construction of 8 or 9 luxury homes, two located on property accessible via Macomb Street and 6 or 7 accessible only

57

via the now-closed portion of Klingle Valley Road. These proposals are now before the Historic Preservation Review Board, whose involvement in review has been long-standing. Indeed, the Board considered previous proposals by the Tregaron Limited Partnership to use the same site to construct 22 homes off the existing causeway leading to Washington International School (February, 2004), 10 homes off the causeway (April, 2004), 9 homes off a new on-site road traversing the existing bridle path (September, 2004), and, most recently, a differently configured 9 homes accessed via the closed portion of Klingle Valley Road (February, 2005).

For purposes of its ongoing review, the Historic Preservation Review Board has divided the old Tregaron estate into 6 landscape units, termed "Areas 1 through 6." On February 24, 2005, the Board "determined that no plans for houses should be further studied" in Areas 1 through 3, because of adverse impacts on the Tregaron resource. The developer has no outstanding proposal for houses in Area 4, mostly owned by WIS (although a land swap now under discussion could transfer some portion of WIS's property to the developer, raising the possibility of future development proposals for this Area). The two houses proposed for Macomb Street fall within Area 6. The bulk of the proposed construction, therefore, would fall within Area 5, close to, and accessible only via, the closed portion of Klingle Road.

At the community meeting, the developer's representatives were quite clear that: a) this proposal is "contingent on the reopening of Klingle Road," b) the houses to be sited along Klingle Road constitute the "economic engine" for the project, c) the proposed houses would be substantial in size (i.e., 5,000 to 6,000 sq. ft. and 3 levels high), d) the proposed houses would be sufficiently valuable to the developer to enable the partnership to contribute over $1 million to a non-profit for rehabilitation of the old Tregaron estate, and e) the developer has "exhausted all other options with the Historic Preservation Board." In other words, if Klingle Road is not reopened, the houses cannot be built unless the Historic Preservation Review Board reverses itself and agrees to consider siting options it has previously opposed. This is precisely the type of development which NEPA requires agencies to analyze in the EIS.

58

In focusing on growth, the Draft EIS should also identify other growth likely to be expected in the area in addition to the Tregaron property. As noted earlier, there are numerous plans for development at area schools and at the Washington National Cathedral which are not mentioned in the Draft EIS. In addition, significant new development for the study area as a whole is forecast in the Wisconsin Avenue Corridor Transportation Study. This, too, should be discussed in the Draft EIS.

## XVI. The Draft EIS Does Not Consistently Or Adequately Define the "Study" Or "Project" Areas Or Accurately Locate City Streets Or Watersheds.

Environmental impact statements must be "concise, clear, and to the point." 40 CFR 1502.1. CEQ regulations specify EISs "shall be written in plain language and may use appropriate graphics so that decisionmakers and the public can readily understand them." 40 CFR 1502.8. The information contained in an EIS "must be of high quality [since] accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." 40 CFR 1500.1(b).

The Draft EIS for Klingle Road fails to meet these basic requirements. The Draft employs multiple, inconsistent, and flawed definitions of the "study" and "project" areas. These definitions compromise the clarity, accuracy, and utility of the document and, by excluding certain key geographic areas from the defined "study" and "project" areas, preclude full and fair analysis of potential impacts. Errors in the name, layout, and location of city streets further muddle the document and impede public scrutiny, compounding the harm as outlined below.

### A. The Draft EIS Employs Inconsistent Definitions Of The Study Area.

The Draft EIS provides five different – indeed, critically inconsistent – definitions of the purported "study area." These inconsistencies render essential components of the Draft EIS incomprehensible and cause the authors to omit key areas of analysis. The five definitions are as follows:

1. The *text of the Draft EIS* (p. 1-3) defines the purported "study area" as the land bordered on the western side of Rock Creek Park by Wisconsin Avenue, Tilden Street, and Woodley Road and on

59

the eastern side of the Park by 18th Street, Woodland Drive, and Upshur Street:

> "The study area for this project generally extends from Wisconsin Avenue between Woodley Avenue (sic) and Tilden Street and 18th Street between Woodland Drive and Upshur Street, which includes the Cleveland Park, Woodley Park, Crestwood, and Mount Pleasant neighborhoods and portions of Rock Creek Park." DEIS, p. 1-3.

2. The *map* of the "study area" (Figure 1-2, p. 1-5) portrays a markedly different study area from that defined in the text of the Draft EIS. On the western side of Rock Creek Park, the map both *excludes* the northern portion of the study area described in the text (i.e., Tilden Street and the area south of Tilden to Rodman Street) and roughly doubles the north to south dimensions of the study area by *including* a southern section between Woodley Road and Calvert Street. On the east side of the park, Figure 1-2 *excludes* the northern portion of the study area (i.e., Upshur Street and the area south of Upshur to Shepherd Street) and *does not depict* the southern boundary of the study area. (The southern boundary described in the text, Woodland Drive, is actually located west of the Park and does not connect to 18th Street.)

3. The *text of the Stormwater Management Plan*, Appendix C of the Draft EIS, defines a third purported "study area:"

> "The study area is bordered on the west by Wisconsin Avenue....The northern boundary of the study area continues along Quebec Street to 34th Street, then south to Porter Street, crossing Connecticut Avenue and following alongside Porter Street until the discharge of Klingle Creek into Rock Creek. The Klingle Creek study area consists of the Klingle Creek project area, as well as all areas where stormwater is piped via storm sewer trunk lines, which converge near Porter Street to discharge through a common headwall structure (outfall #3) into Rock Creek as shown in Figure 1-4.... The southern boundary of the project extends from Wisconsin Avenue on the west, along the ridge on which the Washington Cathedral is located, and cuts across the upper third of the Cathedral

property to Klingle Road. The southern boundary of the project area continues along the centerline of Klingle Road to Cortland Place, along Cortland Place to Devonshire Place, and then follows Devonshire Place east approximately 150 feet to Connecticut Avenue. The watershed (sic) follows Connecticut Avenue south to the National Zoological Park, and then moves through the zoo approximately 1,800 feet east to a ridge which drains down to Klingle Creek at the outfall to Rock Creek." DEIS, Vol. II, App. A, pp. 2-1 to 2-2.

Since these boundaries are largely determined by the location of sewer lines rather than watershed drainage or topography, they exclude analysis of stormwater runoff which flows downgradient and overland (e.g., during heavy storm events or whenever storm sewers become blocked) into sewers in the project area or directly into Klingle Creek. This, in turn, causes the stormwater management plan to *underestimate* both the true flow volume to be expected in affected sewer lines and the degree of stream erosion likely to occur in Klingle Creek.

4. The *maps in the Stormwater Management Plan,* Figures 1-5 and 2-1 (DEIS, Vol. II, App. A, pp. 1-9 and 2-6) depict yet another "Klingle Creek Project Area and Study Area." Both maps lack any key; each shows an area shaded gray, an area shaded blue, and an area outlined by a black line, the import of which is never explained. The study area is defined as "the sum of the area shaded in blue and the area shaded in grey." DEIS, Vol. II, App. A, p. 1-4; see also App. A, p. 1-2. This area differs from that described in the text of the plan in several respects: it appears to proceed *north* from Quebec to Rodman Street (rather than south to Porter), it includes an area *south* of Klingle Road before the intersection with Cortland Place, and the *southeastern boundary does not coincide* with the Cortland-Devonshire-Connecticut-Zoo boundary described in the text. Because these map boundaries also appear to reflect the location of sewer lines rather than watershed drainage or topography, they lead to the same analytical flaws noted above.

5. Finally, the Klingle Road EIS *Traffic Impact Study*, Appendix D of the Draft EIS, claims to have evaluated "traffic operations in the

61

study area for all considered alternatives." DEIS, Vol. III, App. D, p. 1. The Traffic Impact Study does not define its "study area;" however, the map (Figure D-2, DEIS, Vol. III, App. D, p. 5), unlike all of the previously defined "study areas," does not extend east of 19th Street or west of 34th Street/Reno Road and, hence, does not include either 36th Street or Wisconsin Avenue. Omission of the latter major arterial is, indeed, odd since "connectivity" of arterials is the Draft EIS's stated rationale for reconstructing Klingle Road. In any event, failure to include the Wisconsin Avenue artery in the traffic impact study area means traffic impacts at key intersections (e.g., Wisconsin Ave./Woodley Rd. and Wisconsin Ave./Garfield St.) are not addressed by the Draft EIS.

**B. The Draft EIS Employs Inconsistent And Unduly Narrow Definitions Of The Project Area**

The text of the Draft EIS adopts a narrowly circumscribed definition of the project area:

> "Generally speaking, the project area is the 0.7-mile stretch between Porter Street and Woodley Road where land, contiguous to and including Klingle Road and Klingle Creek, lies 65 feet of the Klingle Road centerline along Klingle Creek." (DEIS, p. 1-3; see also Figure 1-3, p. 1-7)

The text of the stormwater management plan employs a broader, but still unduly limited, description of the project area:

> "Because the entire north area of the Klingle Creek study area does not contribute any stormwater runoff to Klingle Creek (i.e., stormwater from this area is conveyed via stormwater pipe to Rock Creek) it is not considered as part of the project area of the Klingle Creek Stormwater Management Plan. Similarly, the stormwater runoff for the area between Wisconsin Avenue, Ordway Street, Laurel Street (sic), and 31st Street (sic) is conveyed via stormwater pipe to Rock Creek. Therefore this area is not considered in the Stormwater Management Plan, because the scope of the Stormwater Management Plan encompasses only those flows which pass through Klingle Valley, and subsequently into Klingle Creek. The area encompassing

the overland flows draining to Klingle Creek is referred to as the *Klingle Creek project area.*" DEIS, Vol. II, App. A, p. 1-3.

This definition assumes that, in an area served by storm sewers, *all* storm runoff enters the sewer lines, regardless of the severity of the storm, the diameter of the pipe, the slope of the land, the grade or condition of the roadways, the degree of pervious or impervious surface, the depth of the water table, the impact of ice and snow melt, the barriers created by snow plowing and shoveling, and the extent to which sewer lines are broken, in disrepair, or blocked by debris. This assumption defies common sense – as well as the District's own recent experience in Klingle Valley. For example, the sewer near the Macomb Street entrance of the Washington International School, a sewer in the Draft EIS "project area," recently required repair due, in part, to runoff from outside the "project" area. Likewise, water running off the John Eaton Elementary School property as well as down the steeply sloped 33rd Street in front of the school can and does enter the "project" area defined in the Stormwater Management Plan, increasing the volume and velocity of runoff in Klingle Valley. Yet neither runoff source is considered in the Draft EIS Stormwater Management Plan because the Draft EIS mistakenly equates "project area" with sewer layout rather than water drainage patterns.

## C. The Draft EIS Contains Numerous Other Geographic Errors

Finally, the Draft EIS is riddled with errors respecting street names, layouts, and locations. For example:

- Woodley Avenue should be correctly described as Woodley Road. (DEIS, p. 1-3)
- Tilden Street does not connect to Wisconsin. (DEIS, p. 1-3)
- Woodland Drive does not connect to 18th Street and does not lie east of Rock Creek Park. (DEIS, p. 1-3)
- The area described as "between Wisconsin Avenue, Ordway Street, Laurel Street, and 31st Street" does not exist. (DEIS, Vol. II, App. A, p. 1-3)
- The legends to Figures 1-4 and 2-2 (DEIS, Vol. II, App. A, pp. 1-8 and 2-2) erroneously label each map a "watershed" when they instead depict the storm drainage system.

63

## XVII.  Conclusion

NEPA requires that agencies provide the public with a Draft EIS that affords meaningful opportunity for comment:

"The draft statement must fulfill and satisfy to the fullest extent possible the requirements established for final statements in section 102(2)(C) of the Act." 40 CFR 1502.9(a).

Where this does not occur, CEQ mandates the remedy:

"If a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and circulate a revised draft of the appropriate portion."  40 CFR 1502.9(a).

DDOT should revise this Draft EIS and resubmit a corrected version for public comment as mandated by NEPA.

64